## CIVIC ASS'N. OF WYOMING v. RAILWAY MOTOR FUELS, INC., ET AL. (Two cases)

(No. 2196; August 19, 1941; 116 Pac. (2d) 236)

214

216

·For the appellant, there was a brief by *Samuel S. Ginsberg* and *Nathan H. Creamer* of Denver, Colorado, and *Edwin W. Baron* of Cheyenne, Wyoming, and an oral argument by *Mr. Ginsberg*.

For the defendants and respondents, there was a brief by *S. E. Torgerson* and *L. V. Halcomb* of Kimball, Nebraska, and *Albert D. Walton* of Cheyenne, Wyoming, and oral argument by *Messrs. Torgeson* and *Walton*.

RINER, Chief Justice.

The record before us in this litigation presents a direct appeal from a judgment of the district court of Laramie County disposing of two cases instituted under Chapter 73 of the Laws of Wyoming enacted by the Twenty-fourth State Legislature in 1937 and generally known, as stated in the opening words of the title thereof, as "an Act relating to unfair competition and discrimination." These two cases, designated in the trial court respectively as No. 25-22 and entitled there "Civic Association of Wyoming, a Colorado corporation, plaintiff, v. Railway Motor Fuels, Inc., a Wyoming corporation, and Alfred Torgeson, defendants," and as No. 25-23 and entitled there "Civic Association of Wyoming, a Colorado corporation, plaintiff, v. Railway Motor Fuels, Inc., a Wyoming corporation, Alfred Torgeson, and R. E. Cheever, defendants," were consolidated for trial purposes. Hence a single record brings them here for a review of the judgment aforesaid, and they may properly be considered in one opinion.

For convenience and brevity the Civic Association of Wyoming, a corporation organized and existing under the laws of the State of Colorado and authorized to transact business in this State as a foreign corporation, will ordinarily be referred to hereinafter as either the "plaintiff," the "appellant" or the "Association." For like reasons the defendant and respondent, Railway Motor Fuels, Inc., a corporation organized and existing under Wyoming laws, will be usually subsequently herein mentioned as the "Fuels Company." The other defendants and respondents will be referred to by their individual names. The defendant Alfred Torgeson is vice-president and treasurer of the Fuels

Company, and the defendant R. E. Cheever was associated with Torgeson and one Gene R. Brown, the son-in-law of Torgeson, in the management of the business of the Fuels Company at the Wayne Daniel Service Station, hereinafter mentioned under an oral contract which was subsequently reduced to writing. Case No. 25-22 will occasionally be referred to as the "wholesale case," and No. 25-23 as the "retail case." The facts and history of these controversies so far as need be detailed here appear to be substantially as follows:

On the 27th day of March, 1940, the Fuels Company commenced the management of the Wayne Daniel Service Station, located at 2002 Carey Avenue in the City of Cheyenne, and sold gasoline to the general public at retail. There were two types of this gasoline sold. The better grade thereof known as "Calso Bronze" sold at twenty cents per gallon, and an inferior grade or "Flight" sold at eighteen cents per gallon, these being the then retail prices for these two grades of motor fuel generally maintained by this and other dealers in competitive gasoline in the City of Cheyenne. During the days following and until March 30, 1940, the volume of business transacted at the service station aforesaid was wholly unsatisfactory. On that date the price of gasoline at the service station aforesaid was reduced by Torgeson and his associates to 12.8 cents per gallon for the Calso Bronze gas. This price was maintained until April 6th following, when it was raised to 13.8 or 13.9 cents per gallon, and about April 11,1940, the price was again increased to 14.9 cents per gallon. The reasons for these changes in price were, as testified to by Torgeson, called for cross-examination by the plaintiff under the statute (Section 89-1705 Wyoming Revised Statutes, 1931) upon the final hearing of these cases, as hereinafter described; that the Fuels Company suffered a loss by selling at 12.8 cents a gallon, and that in order to keep its profits

uniform the price was raised to 13.9 cents a gallon, the price being governed entirely by the volume of gasoline sold by that company. This last mentioned price was maintained until "we raised it to 14.9, at which time we stabilized the price in keeping with the continuous volume—the volume that might be expected to continue permanently."

The price of 13.9 cents per gallon appears to have been satisfactory to the Fuels Company and its managers, but two of its competitors came around to its place of business and discussed the matter with its managers. Upon the urging of these competitors the price was raised by the Fuels Company to 14.9 cents per gallon, where it was maintained until May 1, 1940. On that date, after a hearing had on April 30, 1940, at which all parties to the litigation were present by their counsel, upon evidence adduced and argument had, the district court issued a temporary injunction restraining the defendants and their agents from advertising for sale or selling Calso Bronze gasoline at retail at less than 16.95 cents per gallon and from advertising for sale or selling this type of gasoline at wholesale at less than 13.45 cents per gallon. These prices were adjudged by the court from the evidence at that time submitted to it as the cost prices to the Fuels Company for the latter's retail and wholesale sales respectively, under Chapter 73, Laws of Wyoming 1937, supra.

Thereafter and on August 5, 1940, another judge sitting, these cases were given final hearing, and all parties again introduced evidence and were again heard by counsel. At that hearing plaintiff introduced in evidence for the purpose of proving that the defendants were selling below cost, what it designated as an "established cost survey," as provided in that portion of Section 4 of Chapter 73, Laws of Wyoming, 1937, aforesaid, reading:

"Where a particular trade or industry, of which the

person, firm or corporation complained against is a member, has an established cost survey for the locality and vicinity in which the offense is committed, the said cost survey shall be deemed competent evidence to be used in proving the costs of the person, firm or corporation complained against within the provisions of this Act."

This cost survey was obtained, as the record before us discloses, in the following manner:

There were immediately preceding and during the period covered by this litigation approximately fifty retail dealers in gasoline and motor oils and approximately fifteen wholesale dealers in these products in the City of Cheyenne and vicinity. On April 2, 1940, a meeting of some of the wholesale and retail dealers in these petroleum products was held in said city, and a motion was "passed":

"That the Retail Petroleum Dealers of Cheyenne, Wyoming and vicinity form an unincorporated association under the name and style of 'Cheyenne Retail Petroleum Dealer's Association' for the purpose of prosecuting and enforcing the Unfair Competition and Discrimination Act of Wyoming, and for the purpose of making necessary surveys of cost of doing business and doing all things to enforce and to aid in enforcing said Unfair Competition and Discrimination Act of the State of Wyoming. This association shall be composed of both wholesale and retail dealers in petroleum products."

Officers consisting of a president and secretary were also selected, and on motion recited as "passed" these officials were "designated as a committee to proceed, as soon as convenient to make a cost survey for the Retail and Wholesale Petroleum Trades in the City of Cheyenne and vicinity, the purpose of which cost survey shall be to ascertain and determine the average cost of doing business or overhead for said Retail and Wholesale Petroleum Trades and to establish a cost

survey for the City of Cheyenne, Wyoming, and vicinity pursuant to the provisions of the Unfair Competition and Discrimination Act, and said Committee is hereby authorized and directed to employ the Associated Independent Business and such person or persons as said Associated Independent Business may designate to aid in the making of said cost survey and that said committee report the results of said cost survey to this association as soon as practicable after the survey has been made."

As shown by the certificates in the record and received in evidence on final hearing of these cases without objection, the "Associated Independent Business", as a Colorado Corporation, on April 9, 1940, filed an amendment in the office of the Secretary of State of Wyoming changing the name of that corporation from "Associated Independent Business" to "Civic Association of Wyoming." In other words, the name of the plaintiff in the instant cases was originally "Associated Independent Business." The minutes of the meeting aforesaid supply a list of those who were present and who desired to indicate by signature that they wished to become members, and it appears that some twenty names were thus affixed as such members. A. S. Johnson, president of the plaintiff corporation, as a witness for the plaintiff on final hearing, in response to the question, "To whom did you extend invitations to attend that meeting?" answered "All the dealers in that line of business." The same official also stated that the plaintiff obtains its own membership by "personal solicitation" and these members must be "independent merchants" and residents of Wyoming or Wyoming corporations, and it would appear that they must pay certain fixed fees for this privilege.

On April 12, 1940, the "Cheyenne Retail Petroleum Dealers' Association" held another meeting. The number of members who were present at that meeting does

not appear. At that assembly two motions were "passed," one reading:

"That the survey, as made by the committee of the Cheyenne Retail Petroleum Dealers Association, showing the cost of doing business in Cheyenne, Wyoming to be 26.05 per cent of the net sales, is hereby adopted as the established cost of doing business for the retail petroleum trade in the City of Cheyenne, Wyoming.";

and the other containing similar language but adopting 9.8 per cent of the net sales "as the established cost of doing business for the wholesale petroleum trade in the City of Cheyenne, Wyoming." The final motion "passed" at this meeting was:

"That the Cheyenne Retail Petroleum Dealers Association hereby go on record as recommending to the Civic Association of Wyoming, the prosecution of law suits to enforce the Wyoming Unfair Competition and Discrimination Act where, in their judgment, a violation has been committed."

On April 15, 1940, at Denver, Colorado, there was a meeting of the Board of Directors of the plaintiff, consisting of three persons, A. S. Johnson, his wife, D. A. Johnson, and one H. L. Jacobsen, who acted as secretary of the meeting. A certified copy of the minutes of this meeting was received in evidence, constitutes a part of the record now before us, and concerning said minutes A. S. Johnson, plaintiff's president testified for the plaintiff that, "they authorized the taking of this survey" and the "bringing of this suit." These minutes recited inter alia that:

"The president further explained that the enrollees of this Association in Cheyenne had been severely damaged, and are being severely damaged in their respective businesses, particularly by deep cut price competition at below cost by Wayne Daniel Service Station in Cheyenne, managed by R. E. Cheever and owned by either Alfred Torgeson or the Railway Motor Fuels, Inc., a Wyoming corporation. The president further

explained that several meetings had been had in Cheyenne, by the members of the petroleum industry in that city, and they had requested the Civic Association of Wyoming to undertake this litigation."

They stated also that a resolution was adopted at the meeting of plaintiff's Board of Directors, which, omitting certain recitals, the substance thereof being as already given in the quoted part of said minutes above set forth, read as follows:

"That the president of this Association, Arthur S. Johnson, be and he is hereby empowered to institute such suit or suits in the City of Cheyenne, Wyoming or elsewhere in Wyoming, against such person, persons, firm or corporation, as are in his opinion violating said Unfair Competition and Discrimination Act, and that he be empowered to employ counsel, and to do all other things legally necessary, proper, and in his opinion, advisable or desirable, in order to enforce said Unfair Competition and Discrimination Act of the State of Wyoming, and to, in general, prevent by law, so near as may be, unfair business practices and competition, which is of a character to injure, damage, or is calculated to injure or damage, the business interests of independent business men and enrollees of this organization."

It would appear from the foregoing and from the testimony of A. S. Johnson, plaintiff's president, that the so-called "established cost survey" was made sometime between April 2, 1940, and April 12th following, and that the said Johnson was assisted in securing it by one Alvis Cromer, the field representative of the plaintiff in Wyoming, both of these gentlemen having been present at the meeting of the Cheyenne Retail Petroleum Dealers Association held on April 2nd and described above. Cromer testified as a witness for plaintiff on the final hearing of these cases and related the steps taken in making the survey aforesaid, to use his own language: "You proceed by having a form drawn up of all items that enter into the expense of

operation in the ordinary business, and then in the particular locality that the survey is being made you offer to the businesses of that particular class the survey and the opportunity to participate in it. There is nothing compulsory that can be did about forcing anyone to cooperate in that survey, so you take the returns voluntarily remitted, and the survey is based on those returns as to the cost of doing business." He stated that after the plaintiff had been thus authorized to make the survey in question the forms for taking said survey were sent to him with instructions to proceed therewith. He then personally offered these questionnaire forms to the gasoline dealers of the City of Cheyenne and vicinity and personally collected such of these forms as were filled out.

The style of questionnaire thus used and the manner in which the blank spaces were filled in thereon is illustrated by the following typical form.:

### "COST OF DOING BUSINESS SURVEY OF PETROLEUM SERVICE STATIONS IN CHEYENNE, WYOMING, and IMMEDIATE VICINITY.

"The legislature of Wyoming has passed an act known as the 'Unfair Competition and Discrimination Act', which provides that no merchandise shall be sold at less than the cost thereof, and that to the cost must be added the items of cost of doing business.

"For the purpose of determining the survey, as provided in said 'Unfair Competition and Discrimination Act,' what the cost of doing business is in Cheyenne, Wyoming and immediate vicinity, we, as a trade association, are taking this survey, and ask you to furnish us the following facts concerning your business.

"(All information received from you will be kept strictly confidential, and used only for the purpose of determining the cost of doing business in the aforementioned locality.)

"Please follow the guide given below, as nearly as possible, and bear in mind the necessity and importance of cooperating in this survey.

"Total sales for period from Jan. 1 1939 to Dec. 31, 1939 ............................................................$20,667.55

"Operating Expenses:

| | |
|---|---:|
| Rent .................................................$1988.41 | |
| Heat, light, power and water....... | 416.90 |
| Taxes and licenses of all kinds.... | 28.98 |
| Insurance; fire, burglary and unemployment ............................ | 114.81 |
| Workmen's Compensation .......... | 74.38 |
| Old Age Benefit Insurance.......... | 37.19 |
| Depreciation of store fixtures.... | 80.00 |
| Employees Salaries........................ | 3709.17 |
| Executive (or proprietor's) Salaries ............................................ | —— |
| Advertising expense...................... | 137.40 |
| Loss on bad debts.......................... | 61.11 |
| Interest on borrowed capital...... | —— |
| Service Accomodations, supplies and expense ................................. | 412.29 |
| Miscellaneous expense................... | 153.23 |
| Delivery expense............................ | —— |

Total operating expenses....$7213.87

"Based on the above figures, which are true according to the records kept by me in the usual course of my business, I find that my cost of doing business is 35 per cent of my net sales.

Code No. –35–

............................................................

Wyoming"

After the returned questionnaires were received by the plaintiff it compiled the average cost of doing business of the industry in the locality involved by taking the entire number thereof, computing them as a whole, dividing them by the number of returns made, and thereby securing the result used as an "established cost survey."

The Summary of the retail questionnaire forms made by the plaintiff reads:

"SUMMARY

Summary of cost of doing business survey of the Pe-

troleum service stations in Cheyenne, Wyoming, and immediate vicinity.

Number of surveys distributed   46.

Number rejected for various reasons, such as incomplete records and not having been in business for the full period of time the survey covers   14.

Number of surveys acceptable   32.

Number of refusals   5.

Number of returns on which this survey is based   27.

According to these surveys 26.05 per cent of net sales is the cost of doing business in Cheyenne, Wyoming, and immediate vicinity."

The questionnaire submitted to the wholesale dealers aforesaid was similar in form to that presented to the retail dealers, said form being as above quoted. The summary made by plaintiff of the results in the wholesale proceeding was to this effect:

### "SUMMARY

Summary of cost of doing business survey of Petroleum Wholesale Bulk Plants in Cheyenne, Wyoming, and immediate vicinity.

Number of surveys distributed   14.

Number rejected for various reasons, such as incomplete records and not having been in business for the full period of time which survey covers.

Number of surveys acceptable   7.

Number of refusals   3.

Number of returns on which this survey is based   4.

According to these surveys 9.8 per cent of net sales is the cost of doing business in Cheyenne, Wyoming, and immediate vicinity."

What is meant by the term "acceptable" in these summaries is not altogether clear and does not seem to be explained in the record before us. It may also be

noted that a number of these questionnaire forms, both as to retail and wholesale businesses, appear in the record with their blank spaces only partially filled in, and notwithstanding this fact they seem to have been used in the computation aforesaid. Mr. Cromer in the course of his cross-examination also testified as follows:

"Q. Now, you have had considerable experience in making surveys, have you, Mr. Cromer?
A. Yes, I have.
Q. In the oil business?
A. In practically all lines of business.
Q. How many oil surveys have you made, in your experience?
A. This is the first oil survey I have made in my experience."

and that the retail survey aforesaid did not undertake to "break down into a unit cost the gasoline business by itself," stating also that it covered the entire business of each dealer; that he, Cromer, took the figures of the party answering the questionnaire; and that it is not customary for the plaintiff to go in and check the figures with the books of such party, but simply to take the figures submitted by the party in his answers set forth in the questionnaire. The same witness further testified on redirect examination that the retail dealers generally handled gas and oil and some of them sold also auto tires and accessories, washing and greasing service and soda pop. It may be observed further that the so-called "established cost survey" was for the period commencing January 1, 1939, and ending December 31, 1939, and that no questionnaires were submitted for a dealer who had "another type of operation" than wholesale and retail.

On April 18, 1940, plaintiff filed its petition in both the wholesale and retail cases. In Case No. 25-22, the wholesale case, two causes of action are undertaken to be set forth. To state them briefly—the first of these

charges, that the Fuels Company on March 30, 1940, and since that date did sell, for the purpose of injuring competitors and destroying competition in the City of Cheyenne, State of Wyoming, "Calso Bronze" gasoline at 13-1/4¢ per gallon, and that the cost of said gasoline to said defendant, exclusive of the cost of doing business was 12-1/4¢ per gallon, and that the said defendant's cost of doing business is in excess of 9.8 per cent of the sale price of said gasoline, making the total cost of said gasoline to said defendant in excess of 13.55¢ per gallon, and that it was therefore selling said gasoline below its cost in direct violation of Section 2, of the "Unfair Competition and Discrimination Act" of the State of Wyoming, all to the damage of that defendant's competitors, and especially members of the plaintiff, who are engaged in similar business, unless enjoined from so doing, and that plaintiff has no speedy and adequate legal remedy. The second cause of action charges that the Fuels Company on March 30, 1940, and since that date, with the intent to destroy the competition of regularly established dealers in oil, gasoline and petroleum products, and for the purpose of preventing and injuring the competition of other persons, firms and private corporations, dealing in the same products, and for the purpose of discriminating between different sections of the City of Cheyenne, State of Wyoming, and for the purpose of discriminating between different retailers engaged in the sale of said products, did sell and offer for sale its "Calso Bronze" gasoline at and for the price of 13.25¢ per gallon, to some dealers, while at the same time offering for sale and selling to Wayne Daniel Service Station, a filling station conducted at Twentieth and Carey Streets, Cheyenne, Wyoming, said gasoline at 12.8¢ or less, per gallon, and that said Wayne Daniel Service Station was in direct competition with the other filling stations who purchased from the said defendant in the

City of Cheyenne, State of Wyoming. It is then averred that such action is damaging to the wholesale merchants in competition with the Fuels Company, and also to retail merchants selling in direct competition with the Wayne Daniel Service Station, and an injunction is sought for want of speedy and adequate legal remedy, to prevent the continuance of this practice.

The last mentioned cause of action appears to be referable to Section 1 of Chapter 73, Laws of Wyoming, 1937, which so far as pertinent here reads:

"It shall be unlawful for any person, firm, or corporation, doing business in the State of Wyoming and engaged in the production, manufacture, distribution or sale of any commodity, or product of general use or consumption with the intent to destroy the competition of any regular established dealer in such commodity or product to prevent the competition of any person, firm, private corporation who or which in good faith, intends and attempts to become such dealer, to discriminate between different sections, communities or cities or portions thereof, or between different locations in such sections, communities, cities or portions thereof in this State, by selling or furnishing such commodity or product at a lower rate in one section, community or city, or any portion thereof, or in one location in such section, community, or city or any portion thereof, than in another after making allowance for difference, if any, in the grade or quality, quantity and in the actual cost of transportation from the point of production, if a raw product or commodity, or from the point of manufacture, if a manufactured product or commodity."

The answer of the defendants to the first cause of action was a general denial and an affirmative defense of an alleged unconstitutionality of the Act aforesaid because of its claimed violation of certain named sections of the Wyoming Constitution. The answer to the second cause of action consists likewise of a general denial and a similar affirmative defense of unconstitu-

tionality. Plaintiff's replication denies the allegations in the affirmative defense to the first and second causes of action.

The pleadings in Case No. 25-23, the retail case, may be shortly summarized thus: Plaintiff's petition alleges that the three defendants, The Fuels Company, Torgeson and Cheever, were engaged in conducting a filling station, the Wayne Daniel Service Station at Twentieth and Carey Streets in the City of Cheyenne, Wyoming, and that they sold and offered at retail sale oils, gasoline and petroleum products to the consuming public of the State of Wyoming, in competition with various and other sundry filling stations and merchants in the City of Cheyenne, Wyoming, who sell the same kind of merchandise; that on March 30, 1940, the defendants offered for sale and sold, and advertised for sale, for the purpose of injuring competitors and destroying competition, regular "Calso Bronze" gasoline at 12.8¢ per gallon, and continued to sell it at said price until the 12th day of April, 1940, when the price was changed to 14.9¢ per gallon, and that since the 12th day of April, 1940, the defendants have sold, offered for sale and advertised for sale for the purpose of injuring competitors and destroying competition said "Calso Bronze" gasoline at 14.9¢ per gallon. That the cost of said gasoline to the defendants, exclusive of the cost of doing business, is 13.25¢ per gallon, and that the defendants' cost of doing business is in excess of twenty-six per cent of the sale price of said gasoline, making a total cost of 16.12¢ per gallon, and that the defendants were therefore selling said gasoline below their cost in violation of Section 2 of the "Unfair Competition and Discrimination Act" of the State of Wyoming. This petition concludes with allegations substantially similar to those set forth in the first cause of action in the wholesale case.

Section 2 of Chapter 73 aforesaid contains this language:

"It shall be unlawful for any person, partnership, firm, corporation, joint stock company, or other association engaged in business within this State, to sell, offer for sale or advertise for sale any article or product, at less than the cost thereof to such vendor, or give, offer to give or advertise the intent to give away any article or product for the purpose of injuring competitors and destroying competition.

"The term cost as applied to production is hereby defined as including the cost of raw materials, labor and all overhead expenses of the producer; and as applied to distribution cost shall mean the invoice or replacement cost, whichever is lower, of the article or product to the distributor and vendor plus the cost of doing business by said distributor and vendor.

"The cost of doing business or overhead expense is defined as all costs of doing business incurred in the conduct of such business and must include without limitation the following items of expense; labor, including salaries of executives and officers, rent, legal rate of interest on capital, depreciation, selling cost, maintenance of equipment, delivery costs, credit losses, all types of licences, taxes, insurance and advertising."

The answer of the three defendants was a general denial and an affirmative second defense of violation of certain enumerated sections of the Federal and Wyoming Constitutions. Plaintiff's reply denies all of the allegations of said second defense.

So far as the above described second cause of action of plaintiff's wholesale case is concerned, the proof appears to be that there was only one retailer to whom a wholesale sale was made by the Fuels Company aside from the Wayne Daniel Service Station, to-wit, the "Willys Service Garage," operated by one Kenneth Sutherland until some time in June, 1940, when that business was closed. It appears also that this garage had a volume of sales to the extent of approximately

only six hundred to eight hundred gallons per month; and that the price charged the Willys Service Garage for "Calso Bronze" gasoline was 13.25 cents per gallon. Just before plaintiff rested its case on final hearing its counsel sought permission to amend the second cause of action in the wholesale case by adding allegations "to the effect that the sales at different prices to the Willys Service Garage on the one hand and to the Wayne Daniel Service on the other, were not made for the purpose of making any allowance or allowances for difference, if any, in the grade and quality, or the quantity, or the actual cost of transportation from the point of production, of this gasoline." This application was denied by the trial court, and plaintiff saved its exception to the ruling.

These two causes were on April 30, 1940, heard by the district court, as already described, first upon an application for a temporary injunction. This was granted and a bond given as the statute directs. Subsequently, on final hearing of the litigation, on August 5, 1940, before another district judge, as hereinbefore stated, the temporary injunction was dissolved on September 13, 1940, and a judgment and decree was ordered for the defendants in both cases. The court found generally in favor of said defendants and each of them and against the plaintiff in both the wholesale and retail cases aforesaid. The court also found, to quote the language of the aforesaid judgment and decree, that the plaintiff "has failed to establish, by a preponderance of the evidence as required by law, that the defendants, or any of them, at any of the times mentioned in said petitions did offer to sell, or sell 'Calso' gasoline at wholesale or retail, at less than the cost thereof to said defendants, or any of them, for the purpose of injuring competitors and destroying competition.

"The Court Further Finds that the plaintiff has

failed to establish by preponderance of the evidence as required by law that the said defendants, or any of them, at any of the times mentioned in said petitions, did sell or offer for sale, with the intent to destroy the competition of any regularly established dealer in oil, gasoline and petroleum products, or for the purpose of preventing and injuring the competition of other persons, firms or private corporations who were, in good faith, attempting to deal in oils, gasoline and petroleum products, or for the purpose of discriminating between different sections of the City of Cheyenne, State of Wyoming, or for the purpose of discriminating between different retailers engaged in the selling of oils, gasoline and petroleum products in "Calso" gasoline at different prices in the City of Cheyenne, State of Wyoming."

It was accordingly adjudged, as already indicated, that the plaintiff take nothing by its petitions aforesaid upon any of the causes of action therein set forth and that each of the defendants "go hence without day," recovering their costs from said plaintiff. Exceptions to these findings and the judgment and decree entered thereon were saved in due course.

As a preliminary matter, it may be here observed that so far as the question of the constitutionality of certain sections of the Act involved raised by defendants' pleadings is concerned, though that phase of the controversies before us is stated by counsel to have been argued to the district court, the latter did not find it necessary to rule thereon, as we have seen, and consequently it will not be necessary for us to consider these points in this opinion.

The contention of the plaintiff appears to be that the "cost survey" as above described, resulting in a percentage cost of doing business determined thereby of 9.8 per cent for wholesale and 26.5 per cent for retail sales, is binding upon the defendants; that the defend-

ants are obliged to add these amounts to their invoice costs, and that a sale below the total amount after having added these cost percentages is a violation of the Act aforesaid. In other words, the plaintiff adds to the invoice cost of "Calso" gasoline delivered to the Wayne Daniel Service Station—that cost being 11.764 cents per gallon—these respective cost percentages, and thereby arrives at figures by the addition of these amounts thus calculated which exceeds the defendants' selling price of "Calso Bronze" gasoline at the different periods and times charged in their petitions.

The defendants on the contrary contend and submitted evidence tending to show that their selling of "Calso Bronze" gasoline at the prices as charged in said petition were never at any time such that the Fuels Company did not receive its replacement cost plus their reasonable and entire overhead expenses, as defined in Section 2 of the Act aforesaid. In support of this contention they tendered the testimony of a certified public accountant based upon his examination of the daily records of the Fuels Company, tending to show that during the period from March 26 to May 9, 1940, they made a net profit on the sale of "Calso" gasoline alone of $383.52, and that on their entire business during that time—which included the sale of that grade of gasoline—they made a net profit of $705.30; that exclusive of the profit on the sale of "Calso" gasoline during this period, the profits on "Flight" gasoline were $10.64, kerosene $7.98, tractor fuels 75¢, motor oils $84.23, cleaning solvent $11.39, accessories, grease and service $209.79, and that these profits were made taking into consideration "the cost of doing business" as defined in Section 2 of Ch. 73, supra.

Under the pleadings described above, the facts as we have delineated them, and the contentions of the parties, one, and perhaps the chief question of paramount

importance in this litigation is what is meant in the quoted portion of Section 4, supra, of the Act by the language "where a particular trade or industry, of which the person, firm or corporation complained against is a member, has an established cost survey for the locality and vicinity in which the offense is committed," and particularly the words "established cost survey." This sort of a "survey" is by the subsequent language of the section authorized to be employed as "competent evidence" to prove the cost of a party defendant under the law invoked. The authorities hereinafter reviewed will be of assistance in disposing of this question so far as it affects the case at bar. However, it may be appropriately noted that the courts generally appear to find it easier to say what an "established cost survey" is not, than what it is.

We may here properly recall, as stated by 59 C. J. 1038, Sec. 616, upon the reasoning of many cases there listed, the principle of statutory construction that

"All statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it. They are therefore to be construed in connection and in harmony with the existing law, and as a part of a general and uniform system of jurisprudence, and their meaning and effect is to be determined in connection, not only with the common law and the constitution, but also with reference to other statutes and the decisions of the courts;"

We are also inclined to agree that, as set forth in State v. Boswell, 104 Ind. 541, 545, 4 N. E. 675

"If construction proceeded upon any other principle, the law of a State would consist of disjointed and inharmonious parts, and conflict and confusion be the result. The light needed for the just interpretation of a statute is not supplied by the statute itself, but comes from other statutes and from the principles declared by the courts of the land. It would be as illogical as mischievous to act upon a single statute found in a

great body of law irrespective of other statutes and other laws, and against such a course the faces of the courts have been long and firmly set."

With these views in mind, we may not overlook that

"It is a well established general rule that a statement of a party, whether oral or written, which is of a self-serving nature, is not admissible in evidence in his favor."

and that this proposition is especially illustrated by a case where the statement is made "under the influence of a controversial spirit." (22 C. J. 220, Sec. 192, and cases cited.) See also Stone v. Union Fire Insurance Company, 106 Colo. 522, 107 P. (2d) 241, where the following language was quoted from 22 C. J. 220, Sec. 193:

"It is a well established general rule that a statement of a party, whether oral or written, which is of a self-serving nature, is not admissible in evidence in his favor. While such statements are usually made because the declarant is for some reason interested, at the time, in having the fact supposed or believed to be as stated by him, the element of present interest is not essential, for it has been considered that the rule applies with full force notwithstanding the fact that the declarant was disinterested at the time when the statement was made."

2 Jones, Commentaries on Evidence, (2nd ed.) 1636, Sec. 895, says:

"It is repeatedly said that 'the declarations of a party in his own favor can never be received in evidence.' The danger of such expressions lies in their partial truth. Ordinarily, it is true, such statements are not admissible. It would obviously be unsafe if parties to litigation, without restriction, were allowed to support their claims by proving their own statements made out of court. Such a practice would be open to all the objections which exist against the admission of hearsay in general, and would also open the door to fraud

and to the fabrication of testimony. It is accordingly a general rule of broad application that the declarations of a party, made out of court and in his own favor, are not admissible in his behalf."

Dikeou v. Food Distributors' Association, (Colo.) 108 P. (2d) 529, was a suit for an injunction by the plaintiff in that case under the Colorado Unfair Practices Act, Ch. 261, p. 1280 et seq., Session Laws Colorado 1937. The district court found that the defendants Dikeou et al., wholesalers in the tobacco business, sold cigarettes below their cost with intent to injure competitors and destroy competition in violation of the statute aforesaid. The defendants introduced a survey made by a registered accountant and not by a certified public accountant of the business of the defendants for the period from January 1 to February 10, 1937, which was made apparently only for use in this particular lawsuit. Concerning this survey, the court said:

"Plaintiff produced a certified public accountant who had had twenty years' experience in a wholesale tobacco business and with other business firms in Denver, whose testimony is not seriously controverted. It is to the effect that since there was no actual separation of the two departments, and no separate account kept of each department, the survey submitted by defendants is theoretical and arbitrary, and does not produce an accurate department division of the business, where, as here, it was carried on under one roof, with one single inventory, with no attempt at separation of the merchandise, and employees serving all customers, whether cash-and-carry or not. In his opinion, the method of allocating cost, by the accounting of defendants, was not according to proper and accepted accounting practices; that he would not, as a certified public accountant, nor did he believe would any other certified public accountant, certify such survey as a correct statement of cost. In view of the admitted inconsistencies and discrepancies appearing in the evidence of accountant for defendants, and by reason of the testimony of the certified public accountant who

appeared for plaintiff, the court, as trier of the facts, was justified in disregarding this survey of defendants, made under the circumstances above narrated. From this evidence the court also could properly reach the conclusion that the cost of the cash-and-carry department, based on this survey, was not 'what business men generally mean, namely, the approximate cost arrived at by a reasonable rule,' and that its promulgation was not in good faith."

The court, while affirming the judgment of the trial court after an examination of the record, which disclosed, in the opinion of the reviewing tribunal, substantial evidence to sustain the findings made in the lower court, yet said:

"If the evidence were undisputed, that defendants were not selling below cost, or if the trial court had so found from the evidence, our problem would be different."

and concluded its opinion with the statement:

"Only where there is no substantial evidence to sustain the findings within the issues made by the pleadings, is there ground for intervention by an appellate tribunal."

It will be noted that in this case the survey was made for and used by the defendants in support of their case, as pointed out above, and did not purport to be an "established cost survey" under the statute aforesaid.

In Great Atlantic and Pacific Tea Company v. Erwin, 23 Fed. Supp. 70, a Minnesota law similar in verbiage to the Wyoming statute aforesaid (Ch. 73, Laws of 1937) was under consideration by three judges in the district court, 4th division, of Minnesota. There the law (Section 5 of Part 2, Laws Minnesota 1937, Ch. 116), after using language practically identical with that in the Wyoming statute (Sec. 4, Ch. 73, Laws of 1937 above quoted), added the following:

"And it is further provided that where such cost survey has established a fair and reasonable average cost of doing business for that particular trade or industry,

such average cost shall be deemed prima facie evidence of cost of all individuals, firms or corporations of such trade or industry in such locality and vicinity; and sales at prices less than the actual replacement cost of the goods plus such average cost as above described, shall be deemed to be sales below cost, within the provisions of this act."

Holding this section of the Minnesota statute unconstitutional, the court, in discussing the phrase "cost survey" used this language:

"While it seems probable that the Legislature in enacting this section had in mind some definite and understandable thing, we think that they failed to express it in plain language. What is a 'cost survey,' and by whom or by what is it made? Does the section relate to surveys made by trade groups and associations of which an accused merchant is a member, or does it relate to anything which is denominated a 'cost survey' no matter who makes it? Is a 'cost survey' evidence regardless of whether it is fair or unfair? By the terms of this section a cost survey is prima facie evidence when it is shown to have established a fair and reasonable average cost—but is the question of the fairness and reasonableness of the cost survey a question of law for the court to determine in a collateral inquiry, or is it a question of fact for the jury? How extensive is the locality or vicinity affected by any cost survey?"

In Associated Merchants of Montana v. Ormesher, 107 Mont. 530, 86 P. (2d) 1031, 1035, the court upheld a provision of law similar to the Wyoming statute, saying:

"This statute, it should be noted, simply establishes the admissibility of such evidence. It does not purport to prescribe the weight or credibility to be given to the evidence, as did the statute which was condemned on this ground in Great Atlantic & Pac. Tea Co. v. Ervin, supra. Also, there was in the Minnesota statute other features, not in ours, upon which the court rested its conclusion as to the invalidity of the cost survey pro-

visions. Rules of evidence are subject to legislative control so long as defendant is given a fair and impartial trial and so long as no unconstitutional limitation is violated. State v. Pippi, 58 Mont. 116, 195 P. 556."

Under the Tennessee Unfair Sales Act of 1937, which provided that a retailer's minimum selling price should be the cost of the commodity plus a mark-up amounting to not less than the minimum "cost of distribution by the most efficient retailer," it was held in Acme Distributing Company v. Thoni, 23 Tenn. App. 638, 136 S. W. (2d) 734, that an injunction should not issue to restrain sales of gasoline at less than cost, as defined by the Act. The evidence in the case embraced testimony on behalf of the complainant by experts who were chief executives of large companies dealing in gas and oil, that the cost of distribution by the most efficient retailer was between twelve percentum and twenty-three percentum, and defendant's own evidence that his cost of distribution was only seven percentum, due to low rent and small wages paid to members of his own family. It was shown also that all of these large corporations dealt in gasoline and oil and several of them also sold tires, batteries, and supply services of several kinds. Each one's cost of distribution, or overhead expenses, was calculated on the business as a whole, and no attempt was made to determine the share of the overhead expense which should be correctly allocated to the gasoline end of the business. The court held also that the cost of distribution by the most efficient retail dealer had not been shown, and that:

"Also there is no evidence to show what proportion of the overhead should be allocated to gasoline."

All the parties to the case at bar cite and rely upon our case of State v. Langley, 53 Wyo. 332, 84 P. (2d) 767. In that case the defendant, by his plea of guilty,

admitted that he sold merchandise below cost with intent to injure competitors and destroy competition in violation of the statute—a very different situation from that with which we are now confronted. But it was there pointed out that:

"The statute in question condemns acts committed with intent (a) to injure competitors and (b) to destroy competition."

In Eckdahl v. Hurwitz, (Wyo.) 103 P. (2d) 161, where there was a trial and evidence was submitted in support of a suit for an injunction under the provisions of Chapter 73, Laws of 1937, supra,

"The district court in its judgment aforesaid found that the evidence submitted in the cause failed to show that the defendant in his methods of transacting business aforesaid 'sold merchandise for less than cost, since the whole or entire transaction must be considered, and the evidence shows that Al Hurwitz, defendant, made money on the entire transaction; and, further, the evidence fails to show that said acts of defendant injured competitors or destroyed competition; and that for the reasons set forth there is no violation of Chapter 73, Wyoming Session Laws, 1937,' "

we held that the evidence fully supported the trial court's views of the matter in controversy as described above.

The case of State v. Sutton, 2 Wash. (2d) 523, 98 P. (2d) 680, was one of original certiorari proceeding by the State of Washington on the relation of Pay Less Drug Stores, et al., against a superior court judge who had issued a restraining order on a complaint filed by the prosecuting attorney of Kitsap County, in the office of the clerk of the superior court for that county, under Laws of Washington 1939, Ch. 221, p. 923, designated as the Unfair Practices Act. This act embodied language in section 6 thereof similar to that quoted from Section 4 of the Wyoming act as above set forth. Stat-

ing briefly the substance of the complaint thus filed, the court described it as follows:

"After formal allegations, the complaint alleged that since June 7, 1939, when chapter 221, page 923, of the Session Laws of 1939, known as 'Unfair Practices Act,' became effective, the defendants had, in their store, sold various brands of cigarettes and tobaccos at less than the cost thereof, as defined by the act, and had been using these articles as 'loss leaders' in the promotion of sales of other merchandise, all in violation of the statute above referred to. It was also alleged that the business practice of defendants in the particular mentioned was unfair, and was for the purpose of destroying competition and obtaining an unfair advantage over the other merchants engaged in the same business. It was further alleged that the tobacco and cigarette trade in and around Bremerton had established a cost survey in connection with the retail sale of cigarettes and tobacco, and that in accordance with this survey, certain brands of cigarettes and tobacco could not be sold at prices less than prices set forth in the complaint, without selling the tobacco at less than cost. *There was no allegation as to when this 'cost survey' was made.* The complaint concluded with allegations that the defendants there in named had violated the statute, to the damage of the public generally; that no adequate remedy at law existed; and that the defendants would continue their alleged unlawful practices unless restrained by order of the court. The complaint demanded the issuance of a temporary restraining order." (Italics ours.)

In the course of the opinion filed in that case, the court said concerning the complaint aforesaid and the language of the statute "established cost survey":

"The complaint does not allege that the defendants had been requested by anyone to conform to the alleged cost survey, or even that defendants had knowledge thereof. * * * In the case at bar, it nowhere appears when the so-called 'cost survey' referred to in the complaint was established. It is a fair deduction from the allegation of the complaint above quoted, to the effect that the

local trade 'has made and now has an established cost survey,' that the same was established not long prior to the institution of the action, but in any event, it should not be assumed in aid of the complaint that the cost survey had been established for any considerable length of time. Prior to the enactment of the law upon which this action was based, there was no statutory authority whatever for the establishment of cost surveys. It does not appear from the record that relators made any change in their prices subsequent to the establishment of the cost survey, or at any time. So far as they were concerned, the status quo had been consistently maintained by them. The statute does not specifically provide that the merchants of any particular class may set prices to which all other merchants must conform. Section 6 of the act simply provides that if a particular trade has established a cost survey for the locality, the survey constitutes competent evidence which may be used in an attempt to prove commodity costs of an alleged violator of the act. Section 15, which declares the purpose of the act, provides in part as follows: 'The purpose of this act is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented.' Manifestly, the declared purpose of the act might not be served by the establishment of prices at which all dealers must sell certain commodities. * * * It would seem that a merchant who sells at lower prices than his competitors may not necessarily be selling at less than cost, that matter depending, as to him, upon a number of factors."

The order under review was reversed.

Johnson v. Farmer (Cal. App.) 107 P. (2d) 959, was an action by Johnson against Farmer and others to enjoin the defendants from selling photo-engravings below cost of production under the California Unfair Practices Act. The court below found

"that the defendants, for the purpose of injuring the plaintiff, had manufactured and sold certain cuts for

less than their cost of production and that on numerous occasions the defendants had sold cuts and plates at prices below their cost to the defendants, 'which cost is and was in accordance with the Standard Scale for Photo-Engravers Form H, dated August 1, 1932,' "

and entered judgment accordingly for the plaintiff, granting him an injunction

"enjoining the defendant from selling, for the purpose of injuring the plaintiff, any cut for less than its cost of production, as defined in the Unfair Practice Act, and specifically enjoining the defendants from selling for the purpose of injuring the plaintiff any cut or product manufactured or produced in the photo-engraving business 'at a price or charge less than computed from and designated by the Standard Scale for Photo-Engravers Form H, dated August 1, 1932.' "

Discussing Section 5 of said Act, from which the Wyoming Law in that particular and in general was taken, the court said:

"Section 5 of the Unfair Practice Act provides that where the particular trade or industry in question has an established cost survey for the locality in which the offense is claimed to have been committed, this cost survey shall be deemed competent evidence in proving the costs of the person or firm complained against. The respondent's exhibit 1, the 'Standard Scale' above referred to, was admitted into evidence as such a cost survey, over the objection of the appellants. The importance and weight given to this scale is shown by the facts that the appellants were specifically found to have sold cuts for less than the cost of production, being the prices named in this schedule, and that they were enjoined from selling such cuts at prices or charges less than those designated therein. It appears that this scale, exhibit 1, was prepared by the American Photo-Engravers Association in 1932 from records obtained from that industry throughout the entire United States. The respondent argues that, since Santa Ana is in the United States, this scale is the cost survey for that locality within the meaning of section 5 of the Unfair Practice Act; that it was used by both respond-

ent and appellants 'in pricing their products'; and that 'since the trial court did adopt the scale and make it a part of its judgment, it must have found that such survey represented the costs of these defendants.' Assuming that this was an average cost survey for all of the United States it may well be questioned whether it could be deemed competent evidence in proving costs of a particular firm in one particular community, under the provisions of section 5 of the Unfair Practice Act. Be that as it may, the scale itself indicates that it was not prepared, intended or established as a cost survey."

On the same subject the court also said:

"It is obvious that this scale, exhibit 1, should not have been admitted as a cost survey and that, in itself, it is not sufficient to prove the cost of production to the appellants of the cuts sold by them. The respondent argues that it is immaterial in this case whether or not this scale, exhibit 1, is actually a cost survey since other evidence which was introduced shows that this scale 'represents the cost to these defendants.' After a diligent search we are unable to find any such evidence in the record. Not only does it clearly appear that this scale has nothing to do with the appellants' cost of production, but we can find no evidence in the record showing what these costs were, and there is no finding as to what they were except the unsupported finding that the scale, exhibit 1, designated such costs."

The judgment of the trial court was reversed.

Chapter 73, Laws 1937, contains no definition of the phrase "established cost survey," and just what ultimate meaning will be ascribed to it by the courts is not now precisely clear. The word "established," as "usually understood, means settled, fixed, confirmed." Suit v. State, 30 Tex. Cr. R. 319, 322, 17 S. W. 458; 15 Words & Phrases (permanent edition) 172. By the use of this word "established" before the words "cost survey," it would seem that the legislature meant a cost survey that is generally recognized by those engaged in the trade or industry covered by such cost

survey as being accurate and reliable. Where there are different phases of a general trade or industry, such survey should deal with the particular one involved in the investigation. Shortly stated, it would appear that before a cost survey should be "deemed competent evidence" in proving the costs of a defendant under said Chapter 73, supra, it should be shown that such survey is generally accepted as truly reflecting the cost of doing business for such trade or industry or the particular phase thereof involved in the locality or vicinity where the defendant is carrying on his business.

The School of Business of the University of Chicago's publication "Cost Under the Unfair Practices Acts," by Robert Tannenbaum of the Oklahoma Agricultural and Mechanical College, adapting material taken from the brochure "The Cost Principle in Minimum Price Regulation" by Professor Herbert F. Taggart, Associate Professor of Accounting in the University of Michigan, concerning the "Established Cost Survey" appearing in the statutes of the several states, the parent thereof being the California Unfair Practices Act already mentioned, indicates that a cost survey, to be of substantial value, should "probably have the following characteristics":

"1. The information on which it is based should be collected in such a way that there is no possibility of juggling or tampering to obtain a result desired by the trade groups.
a) The reports from individual members of the trade must be prepared by them or their own accountants.
b) They must be sworn or otherwise certified as correct.
c) They must be received and compiled by some agency which is unquestionably unbiased.
d) The questionnaires and instructions used for obtaining the information must be drawn so as to exclude bias in any direction and so as to insure maximum comparability and representativeness of results.

e) They must be made available to every known member of the trade or industry in the locality to be covered.

f) Every return from the questionnaire must be utilized in the compiled results, or the reasons for its exclusion must be thoroughly explained.

2. The returns from the questionnaire must be sufficiently numerous and sufficiently varied as to guarantee that the result is a representative cross section of the trade or industry in the area covered. The representation must be adequate numerically and from the standpoints of geographical location within the area, size of enterprise, and economic characteristics of the enterprise.

3. The compilations and computations of cost data must be done by the most accepted statistical and accounting techniques.

4. The survey report should exhibit clearly the methods used in accumulating and manipulating the data, the nature of the cost items and statistical measures used, and the resulting figures."

It may well be that some of these suggested requirements above delineated are unnecessary. But we are not inclined to think that the legislature, having regard to the existing state of the law, and with which it is charged with notice, as we have seen, intended by the use of the words "established cost survey" that a biased, incomplete and self-serving statement of costs made with the idea of furnishing evidence in litigation then in contemplation, could be submitted as an "established cost survey," and given credence by an impartial court of justice.

Without presenting more authorities and material touching the matter, it is plain, we think, that the cost survey relied upon by the plaintiff in this case at bar quite fails to be such an "established cost survey" as is contemplated by Chapter 73, Laws of 1937 aforesaid. The so-called "established cost survey" was undoubtedly made, and the results compiled, not by an unbiased agency, but by the plaintiff itself in these very law-

suits, and looking to their institution and successful prosecution. Some of the questionnaires returned were incomplete. They included, too, business operations not involved in the pleadings, such as sales of tires and tubes, solvent fluid, auto accessories, motor oils, grease, and service work, and other things. No attempt seems to have been made to allocate costs to the sale of gasoline, the only article involved in the pleadings. As a matter of fact, the word "gasoline" does not seem to appear in any of the returned questionnaires. The questionnaires aforesaid were made and returned by the parties, some of whom were interested in the plaintiff as members thereof, and to whom they paid dues for such membership privileges. They could hardly be regarded as unbiased sources of information under such circumstances. It appears also by the record that these questionnaires were not verified, or even signed, by the parties returning them.

The record before us establishes also that the defendants conducted their business as a peculiar combination of retail and wholesale sales. They had an operating contract peculiar to themselves, which had the effect of materially reducing overhead costs. It would appear further from the record that only two of the questionnaire returns were made by parties who were engaged in businesses even resembling that of defendants.

So far as the wholesale questionnaires were concerned, it is evident that of the fourteen survey questionnaires distributed, only one-half of these were "acceptable," and what is meant by the term "acceptable" as hereinabove pointed out, is not explained. Further, it appears that the "established cost survey" touching the wholesale phase of gasoline selling is based on the returned questionnaires of only four concerns. An examination of these four shows that only

one of them is filled out with any degree of completeness.

Mr. Cromer, the agent of the plaintiff, who was assigned the task of obtaining the questionnaires, admitted that this was the first "survey" he had ever undertaken dealing with the petroleum industry. Many of the parties returning the questionnaires purchased their gasoline at tank wagon prices and did not buy on the basis of car-load lots or directly from a refinery on the outskirts of the city of Cheyenne, as did the defendants, and as we conceive they had a perfect right to do. The parties last mentioned also proved by the testimony of a C. P. A. that as a result of his examination of their records, they had made a profit on gasoline sales during the period involved in the pleadings in these cases. It may be here noted that the trial court in the Eckdahl case, supra, found that the defendant had "made money on the entire transaction" and that conclusion was upheld in this court as against the contention of plaintiff that the provisions of Chapter 73, Laws of 1937, had been transgressed.

Relative to the wholesale case, it may be observed that under the ruling of the California case of Green v. Grimes-Stassforth Stationery Co., infra—a ruling which to us seems logical—the plaintiffs' petition did not negative the provision in the statute

"After making allowance for difference, if any, in the grade or quality, quantity, and in the actual cost of transportation from the point of production, if a raw product or commodity, or from the point of manufacture if a manufactured product or commodity."

The ruling in Green v. Grimes-Stassforth Stationery Co., 39 Cal. App. (2d) 52, 102 P. (2d) 452, under the California Unfair Practices Act, was that:

"The complaint fails to allege that the respondents sold to other dealers in the same quantities as are here involved at a discount, and fails to allege that the price

differences which are alleged were not based on differences in grade, quality or quantity. This was an essential allegation. Where a party relies for recovery upon a purely statutory liability it is indispensable that he plead facts demonstrating his right to recover under the statute. The complaint must plead every fact which is essential to the cause of action under the statute. Where a party relies on a statute which contains a limitation in the clause creating and defining the liability, as here, such limitation must be negatived in the complaint. These principles supported by authorities from many states are fully set forth in 49 Corpus Juris, sections 167 and 169, pages 151 and 153."

This ruling the plaintiff, to all intents and purposes, conceded as good law and should have been followed in order to state a cause of action, for it sought from the district court the right to amend its pleading, but delayed doing so until just before the plaintiff rested its case. This request was denied by the trial court. The granting of this request was discretionary with the judge who tried this litigation. 49 C. J. 481, Section 613 and cases cited. There was no abuse of discretion shown, as it is apparent from the record that the Willys Service Garage had quit business at the time these cases were tried. It is indicated in 32 C. J. 76, Sec. 63, that

"It has been said that equity acts in the present tense, and that relief is dependent upon present and future conditions rather than solely on those existing when the suit was brought. Hence, although the bill may state good grounds for the granting of an injunction, where events occur after the filing of the bill which render an injunction unnecessary or ineffectual, it will ordinarily be refused."

See cases in support of the text as given in notes. In addition, it may be observed also that the factual finding of the district court was against plaintiff on this phase of the litigation, and in our judgment there was substantial evidence to support it, as above pointed out.

The purpose of the legislature in passing the statute here involved may not, in fairness to all parties concerned, be overlooked, viz., Section 12 of Chapter 73, supra. In that section the language is:

"The Legislature declares that the purpose of this Act is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented. This Act shall be literally construed that its beneficial purposes may be subserved."

The word "literally" is obviously a mistake, as the context shows that it should be "liberally." The same mistake appeared in the parent California law, and the draftsman for the Wyoming legislative bill copied the statute somewhat too accurately. In this connection the pertinent remark of the Supreme Court of Washington in State. v. Sutton, supra, quoted above, may here again be recalled:

"Manifestly, the declared purpose of the act might not be served by the establishment of prices at which all dealers must sell certain commodities,"

in aid of the trial court's judgment in the cases at bar, in addition to the other matters mentioned above. The argument of plaintiff in claiming that the defendants were bound by the so-called "established cost survey" discussed above might very well lead to a disregard of that important purpose.

Referring to the anti-trust and monopoly laws of Congress, Franklin D. Jones' book "Trade Association Activities and the Law" published as far back as 1922, uses this language:

"The instant the cost system is abused, the instant it ceases to reflect actual individual cost, it in spirit violates the law and may easily actually violate it. That there is need for caution in the use of a cost accounting system is shown by the fact that a civil proceeding has

been brought and a consent decree entered against the members of one association because of the use of arbitrary and fictitious schedules of cost. In several other proceedings, the government alleges uniform cost accounting systems have been employed as part of a general scheme to restrain trade. A criminal proceeding is pending against another, one of the charges in the indictment being the alleged improper use of a uniform cost accounting system. If the association goes beyond general educational work designed to secure the general installation of a cost system in the industry and gathers, compiles and publishes cost data from its members, the law can be very easily violated."

Finally, the trial court made its factual findings in the several cases at bar against the plaintiff, as hereinbefore described. After a careful and extensive examination of the record, our conclusion is that there is ample evidence to support these findings and the judgment entered thereon. The district court saw and heard the witnesses and had the authority to give credence to them as it saw fit.

There were other points urged in the briefs and on the hearing in these cases, but as we view the record sufficient has been said to properly dispose of this litigation without further extending this opinion.

However, there is a matter which should be considered before closing this discussion of the cases at bar. The abstract of record prepared by plaintiff in these cases is extremely defective, when viewed in the light of our Rule 37. It contains no narrative form of the testimony in the case; it does not accurately describe the judgments under review; it contains conclusions of counsel as to the effect of the testimony, and it does not "show the evidence essential to give this court jurisdiction," such as the notice of appeal and the service thereof. Counsel for respondents was obliged to furnish a supplemental abstract to present in abstract form some of these deficiencies. We are inclined

to think that, therefore, in justice to all concerned, the cost of the supplemental abstract must be taxed against the appellants in addition to the usual taxation of costs against the unsuccessful party in this court. Rule 37 of this court; Simpson v. Building & Loan Association, 45 Wyo. 425, 19 P. (2d) 958; Fryer v. Campbell, 46 Wyo. 491, 28 P. (2d) 475; Scott v. Ward, 49 Wyo. 243, 54 P. (2d) 805.

It results that the judgment of the district court of Laramie County should be and it is affirmed.

*Affirmed.*

KIMBALL and BLUME, JJ., concur.