**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and State Farm Fire and Casualty Company, Appellants (Petitioners),**

v.

**WYOMING INSURANCE DEPARTMENT, Appellee (Respondent).**

No. 89–144.

Supreme Court of Wyoming.

May 31, 1990.

Rodger McDaniel of McDaniel & Tiedeken Law Offices, Cheyenne, for appellants.

Joseph B. Meyer, Atty. Gen., Hugh Kenny and David K. Gruver, Asst. Attys. Gen., for appellee.

Before CARDINE, C.J., THOMAS, URBIGKIT and MACY, JJ., and ROONEY, J., Retired

ROONEY, Justice, Retired.

This appeal is from the district court's denial of a challenge by appellants to Section 6 of a regulation promulgated by the appellee, which section prohibited use by an insurer of a non-OEM [1] after market part in the repair of an automobile or in the estimate for such repair without the written consent of the insured to the use of such part.[2] The regulation was issued af-

1. The term "non-OEM" refers to after market parts manufactured by someone other than the original manufacturer of the vehicle part.

2. Section 6 of the regulation provides:

"*Consent.* No insurer shall directly or indirectly require the use of non-OEM after market parts in the repair of an automobile nor shall any insurer accept any estimate or authorize any repair of an automobile unless the

ter a public hearing, and appellants/insurance companies timely filed a petition for review in the district court. The resulting order of the district court upheld the regulation.

We affirm.

Appellants word the issues on appeal:

"A. Does the Wyoming Insurance Department have statutory authority to regulate consumer choices between automobile parts manufactured by original manufacturers and those manufactured by non-original equipment manufacturers.

"B. Does the regulation promulgated by the Insurance Department impair contractual obligations between the Appellant and its insureds.

"C. Does the regulation bear enough of a reasonable relationship to its purpose to withstand due process scrutiny.

"D. Is Section 6 of the regulation supported by substantial evidence in the hearing record."

Appellee words them:

"I. Does the Wyoming Insurance Commissioner have statutory authority to regulate insurers' claims settlement practices?

"II. Have appellants shown that Section 6 of the regulation impairs their contractual obligations in violation of Article 1, Section 35 of the Wyoming Constitution?

"III. Is there a rational basis for the promulgation of Section 6 of the regulation?

"IV. Must there be substantial evidence in an administrative record to support the adoption of a regulation?"

The standard provision of the insurance policies in question which is pertinent to this matter requires the insurer to

"pay to repair or replace the property or part with *like kind and quality*. If the repair or replacement results in better than like kind and quality, *you* must pay for the amount of the betterment." (Emphasis added.)

In their arguments, appellants approach the issues with the assumption that appellee is *imposing* the use of OEM parts upon the appellants and that the problem is not one of consumer protection but is one of market competition. Two large industries are involved: the automobile industry and the insurance industry, but also involved is the consumer-insured. In truth, Section 6 of the regulation does not *impose* any use. It gives a choice to the insured. It is concerned primarily with the protection of the insured. The insured's choices are not "regulated" as contended in appellants' wording of the first issue. The insured is only afforded an opportunity to accept a replacement part other than that designated in the insurance policy. His choice is similar to that made by any consumer on the basis of that contained on the labels of two competing products. Any marketing impact is incidental to protection of the insured and to fair and equitable performance under the insurance policies.

With reference to the specific issues:

## FIRST ISSUE: STATUTORY AUTHORITY OF THE INSURANCE COMMISSIONER TO PROMULGATE SECTION 6 OF THE REGULATION

■ The authority of the Insurance Commissioner to promulgate Section 6 of the regulation can be found in more than one statute.

### I

The district court found such authority in W.S. 26–13–102 "specifically as an unfair practice."[3] The district court properly reasoned:

"No person shall engage in this state in any trade practice which is defined in this article or as is determined pursuant to this article to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance."

---

consumer is advised that he or she is not required to accept non-OEM after market parts in the repair of the vehicle and consents in writing to the use of those parts before repairs are made."

**3.** W.S. 26–13–102 provides:

"The policy of insurance gives to an insured the right to a replacement part of like kind and quality. The issue is whether the replacement part is of like kind and quality with respect to the damaged part. Petitioners' argument means that an insured has no contractual right to insist upon OEM parts if a non-OEM part is of like kind and quality to the OEM part.

"This result is not what the insurance contract provides. It does not say that an insured must accept a non-OEM part even if it is of like quality as an OEM part. To be sure, the policy promises the insured that he may have parts of like kind and quality as the *damaged* part. Nobody argues here that an OEM part is not of like kind and quality as the original equipment. If they do, the evidence of record falls short of compelling such a finding. Moreover, the evidence did not show that OEM parts amounted to a *betterment* within the meaning of the policy. The insured has a right to an OEM part even if it costs more, even if it

is of like quality as a non-OEM part because it is not a *betterment,* but rather of like kind as the damaged original equipment.

"The potential that an insurer may require an insured to accept a non-OEM part raises the prospect that an insured may be denied the benefit of his bargain. This threat when coupled with the evidence of record (which casts doubt upon whether OEM and non-OEM parts are truly of like kind and quality) empowers the commissioner to regulate. Section 6 is sustained as a valid exercise of the commissioner's rulemaking authority under W.S. § 26–13–102, specifically as an 'unfair practice.' "

## II

Another statute under which the Insurance Commissioner has authority to promulgate Section 6 of the regulation[4] is W.S. 26–13–124. It sets forth fourteen practices as unfair methods of competition and unfair and deceptive acts.[5] Appellants

---

4. The district court's judgment will be affirmed on appeal if sustainable on any legal ground appearing in the record. *Ely v. Kirk,* 707 P.2d 706 (Wyo.1985); *People v. Fremont Energy Corp.,* 651 P.2d 802 (Wyo.1982).

5. W.S. 26–13–124 provides:

"(a) A person is considered to be engaging in an unfair method of competition and unfair and deceptive act or practice in the business of insurance if that person commits or performs with such frequency as to indicate a general business practice any of the following unfair claims settlement practices:

"(i) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

"(ii) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

"(iii) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

"(iv) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

"(v) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

"(vi) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

"(vii) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;

"(viii) Attempting to settle a claim for less than the amount to which a reasonable person would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

"(ix) Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of, the insured;

"(x) Making claims payments to insured or beneficiaries not accompanied by a statement setting forth the coverage under which the payments are being made;

"(xi) Making known to insured or claimants a policy of appealing from arbitration awards in favor of insured or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration;

"(xii) Delaying the investigation or payment of claims by requiring an insured, claimant or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

"(xiii) Failing to promptly settle claims, where liability has become reasonably clear,

argue that since the use of non-OEM parts in repairs or in repair estimates is not itemized therein, such is not an unfair claims settlement practice.

Although not specifically itemized therein, the practice may result in a violation of subsection (a)(vi) thereof, i.e., "[n]ot attempting in good faith to effectuate * * * fair and equitable settlements of claims in which liability has become reasonably clear." The district court found that "there is substantial evidence of record to support a distinction between OEM and non-OEM parts." The record supports this finding. There would obviously be no "betterment" or "worsening" of value if an OEM part was used for estimate or replacement of the damaged OEM part. If the estimate or replacement was with a non-OEM part of greater value than the damaged part, the insured would be obligated under the contract to pay for the "betterment," but there is no requirement for payment by the insurer for the "worsening" of value if the non-OEM part was less than that of the damaged part. As reasoned by the district court, the situation is obviously one-sided. Thus, the claim settlement condition of the policy is not "fair and equitable." The evidence at the hearing illustrates the difficulty, if not the impossibility, to reach an agreement on the relative value of the OEM and the non-OEM parts. Section 6 of the regulation is a reasonable requirement for resolving the difficulty by allowing the insured to say "yes" or "no" to the use of non-OEM parts. It promotes "good faith to effectuate prompt, fair and equitable settlement of claims" per W.S. 26–13–124(a)(vi).[6]

## III

Beyond that, appellants acknowledge that the Insurance Commissioner may determine a "practice not enumerated in" W.S. 26–13–124 [7] to be an unfair or deceptive practice. Appellants refer to W.S. 26–13–102 [8] in this connection as restricting the authority of the Commissioner with reference to unfair or deceptive acts or practices to those which are either "defined in this article" or "determined pursuant to this article." Appellants then conclude that W.S. 26–13–116 [9] is that referred to in W.S. 26–13–102 [10] as the only method to "determine pursuant to this article" the existence or non-existence of the deceptive acts or practices, and that the Commissioner did not employ the procedure referred to in W.S. 26–13–116 in connection with this matter.

A hearing was held on this issue. Appellants took part in the hearing with full knowledge of the content of the proposed regulation. The procedure here used was in substantial compliance with that required by W.S. 26–13–116. Therefore, appellants' argument for requiring exact itemization of the protected practice in W.S. 26–13–124 before the Commissioner can declare it to be an unfair or deceptive act or practice is a fallacious argument and W.S. 26–13–116 gives the Commissioner authority to promulgate Section 6 of the regulation.

## IV

Not only was the procedure used here sufficiently within that required by W.S.

under one (1) portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage; or

"(xiv) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."

6. See *supra* note 5.

7. See *supra* note 5.

8. See *supra* note 3.

9. W.S. 26–13–116 provides in pertinent part:

"(a) If the commissioner believes that any person in conducting an insurance business in this state is engaging in any method of competition or in any act or practice, not defined in this chapter, which is unfair or deceptive and that a proceeding by him in respect thereto would be in the public interest, after a hearing in which the person charged receives a notice of the hearing and of the charges against him, the commissioner shall make a written report of his findings of fact relative to the charges and serve a copy thereof upon the person and any intervenor at the hearing."

10. See *supra* note 3.

26–13–116(a), and not only could the action be taken pursuant to the authority enumerated in W.S. 26–13–102 and in W.S. 26–13–124(a)(vi), even if not itemized in W.S. 26–13–116(a), but the authority of the Insurance Commissioner to promulgate Section 6 of the regulation is also contained in W.S. 26–2–109(a)(iv) and (v), in W.S. 26–2–110 and W.S. 16–3–101(b)(ix). W.S. 26–2–109(a) reads in pertinent part:

"(a) The Commissioner shall:

\*     \*     \*     \*     \*     \*

"(iv) Execute the duties imposed upon him by this code;

"(v) Have the powers and authority expressly conferred upon him by *or reasonably implied from this code*[.]" (Emphasis added.)

W.S. 26–2–110(a) reads:

"Subject to the requirements of the Wyoming Administrative Procedure Act [§§ 16–3–101 through 16–3–115], the commissioner may make reasonable rules and regulations necessary to carry out any provision of this code [title 26]. No rule or regulation shall extend, modify or conflict with any law of this state or the reasonable implications thereof."

W.S. 16–3–101(b)(ix) reads in pertinent part:

"(b) As used in this act [Wyoming Administrative Procedures Act]:

\*     \*     \*     \*     \*     \*

"(ix) 'Rule' means each agency statement of general applicability that implements, interprets and prescribes law, policy \* \* \*."

The nature of insurance requires that it be extensively regulated. W.S. 26–1–101, et seq. does so, and in doing so, reflects such requirement. That "reasonably implied" from any powers specifically given the Commissioner by "this code" authorizes Section 6 of the regulation. There is a reasonable possibility that the replacement of an OEM part with a non-OEM part could result in less than that required by the policy, i.e., with a part not of "like kind and quality." Section 6 of the regulation reasonably requires notice to the insured of this possibility and allows him to accede to or reject the possibility. It is in conformity with the purpose of statutory regulation of insurance transactions.

## V

Finally, appellants recognize the authority of the Insurance Commissioner to approve the insurance policies used in Wyoming. W.S. 26–15–110(a) provides in pertinent part:

"No basic insurance policy \* \* \* shall be delivered or issued for delivery in this state unless the form is filed with and approved by the commissioner."

The policies with which we are here concerned contain the language requiring the insurer to pay to repair or replace the property with *"like kind and quality."* (Emphasis added.) Although the parties hereto argue at length with reference to the relative *quality* of the OEM and non-OEM parts, the word "kind" also has pertinence. It can mean "a specific variety, type or brand," or it can mean "a fundamental nature or quality"—"an equivalent of that offered or received." *See* Black's Law Dictionary at 782 (1979) and Webster's Third International Dictionary at 1243 (1966). In issuing Section 6 of the regulation, the Commissioner is specifying the meaning approved by him for the ambiguous word "kind," i.e., that it had the meaning of a specific variety or brand, and that the insured could waive the provision of the policy requiring replacement by, or payment per an estimate on, the specific brand. In other words, Section 6 was only clarifying that which the Commissioner did when he exercised his authority under W.S. 26–15–110(a) to approve the policy—a clarification clearly within the Commissioner's power.

In summary, promulgation of Section 6 of the regulation was a reasonable exercise of the authority given to the Commissioner by the indicated statutes. It set forth a reasonable requirement furthering the purpose of the Insurance Code, i.e., to assure fair and equitable insurance transactions.

SECOND ISSUE: IMPAIRMENT OF
CONTRACTUAL OBLIGATIONS
BY SECTION 6 OF THE REGULATION

▮ Article 1, Section 35 of the Wyoming Constitution provides:

"No ex post facto law, nor any law impairing the obligation of contracts, shall ever be made." [11]

Again, the constitutionality of Section 6 of the regulation under Article 1, Section 35 of the Wyoming Constitution can rest on more than one rationale.

I

Section 6 of the regulation does not *impair* a contractual obligation. Obviously, such section is not an impairment on insurance policies issued subsequent to the effective date of the regulation, i.e., subsequent to July 1988. *See* cases under 16A Am.Jur.2d, *Constitutional Law*, § 689 (1979). That section reads:

"Although a statute tending to impair the obligation of a contract is inoperative as to contracts existing at the time of its passage, it may nevertheless be valid and operative as to future contracts. The provision of the Constitution which declares that no state shall pass any law impairing the obligation of contracts does not apply to a law enacted prior to the making of a contract the obligation of which is claimed to be impaired, but only to a statute of a state enacted after the making of the contract. The obligation of a contract cannot properly be said to be impaired by a statute in force when the contract was made, for in such cases it is presumed that it was made in contemplation of the existing law. The state, therefore, may legislate as to future contracts as it sees fit, and accordingly, if a law is prospective only, it is—so far as the guaranty of obligation of contracts is concerned—valid."

*See also Application of Hagood,* 356 P.2d 135, 138 (Wyo.1960).

Most automotive insurance contracts are for a six month term. Accordingly, only a limited number of claims, if any—those made under policies in force on the effective date of the regulation—are subject to appellants' position on this issue. With reference to the limited number of claims made under policies in force prior to the effective date of the regulation, there is no *impairment* since Section 6 of the regulation did not change the vested rights—the duties and obligations of the parties—which existed prior to enactment of Section 6 of the regulation. The contract required appellants to replace the part with, or estimate the value of it on, one of "like kind and value." Section 6 of the regulation does not change this requirement. If anything, it relaxes the obligation of the appellants by allowing replacement by, or estimate on, a part of a different kind ("kind" meaning "brand") with consent of the insured. Section 6 of the regulation clarifies the language of the contract. It does not change such language. Thus, it does not "impair" the contract obligations.

Without consideration of the words "like kind" and directing attention only to the words "like value," the evidence at the hearing reflects the difficulty in determining the relative value between the OEM part and the non-OEM part. Appellants' contention is that only it should determine whether or not the replacing non-OEM part is of equal, greater or less value than the replaced OEM part. Section 6 of the regulation simply places that decision with the insured along with the ability to waive any difference if one exists. Such furthers a fair and equitable settlement of a claim, and it provides for the receipt by the insured of the benefit of his bargain, as noted by the district court.

II

Section 6 of the regulation is reasonable exercise of the police power of the State for the promotion of the safety and welfare of those subject to its jurisdiction. As such, it cannot constitute an impairment of contracts.

---

11. A similar provision is contained in Article 1, Section 10 of the United States Constitution: "No State shall * * * pass any * * * Law impairing the Obligation of Contracts."

"The police power can be generally described as a government's ability to regulate private activities and property usage without compensation as a means of promoting and protecting the public health, safety, morals and general welfare. See *Weber v. City of Cheyenne*, 55 Wyo. 202, 97 P.2d 667, 670 (1940). * * *

\* \* \* \* \* \*

"The legitimate objectives of the police power are loosely characterized as being public in nature and the potential range is very broad. See *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984); *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954)."

*Cheyenne Airport Board v. Rogers*, 707 P.2d 717, 726–27 (Wyo.1985). *See* citations in 16A C.J.S., *Constitutional Law*, § 322 (1984), the introductory paragraph of which reads:

"The state, through its legislature or other properly authorized agency, can prescribe reasonable regulation within the scope of its police power for the conduct of corporate business without impairing the obligation of contracts as they appear in the charters or franchises of the corporations to which they apply."

And see citations in 16A Am.Jur.2d, *supra* at § 405, which reads in part:

"The contract clause of the Constitution does not restrict the power of the state to legislate in the interest of the morals, health, and safety of the public, notwithstanding that one or more of these factors may be involved in contracts of various kinds. Rights and privileges arising from contracts are subject to regulation for the protection of the public health, safety, and morals, in the same sense and to the same extent as is all property, whether owned by natural persons or corporations. Indeed, the principle is frequently stated that all contracts are made subject to the paramount authority of the state to safeguard the vital interests of its people, and all contracts made with reference to any matter that is subject to regulation under the police power must be understood as made in reference to the possible exercise of that power. It follows that not all police legislation which has the effect of impairing a contract is obnoxious to the constitutional prohibition as to impairment; a statute passed in the legitimate exercise of the police power will be upheld by the courts, although it incidentally destroys existing contract rights. Thus, the economic interests of the state may justify the exercise of its protective power notwithstanding interference with existing contracts. The underlying principle is that if the legislature has no power to alter its police laws when contracts will be affected, then the most important and valuable reforms may be precluded by the simple device of entering into contracts for the purpose of doing that which otherwise may be prohibited; the authority of the legislature, in the exercise of its police powers, cannot be limited or restricted by the provisions of private contracts between individuals, or between individuals and corporations."

The nature of the insurance business makes regulation of it more necessary than is required for many other businesses. It is extensively regulated under the police power in Wyoming through statute [12] and through delegation of such power to appellee [13] as reflected *supra* under the first issue. That Section 6 of the regulation is a

---

**12.** *See* Title 26, Insurance Code, i.e., W.S. 26–1–101 through 26–41–103.

**13.** 2 Am.Jur.2d, *Administrative Law*, § 298 (1962) states:

"An act of an administrative agency which is legislative in character and has the force of a statute is subject to the same tests as to its validity as an act of the legislature intended to accomplish the same purpose, whether such acts are rules or regulations, or general orders. This is true of regulations or orders in the exercise of the police power, in conflict with federal law, impairing the obligation of contract, or involving penalties or criminal liability. Thus there are applicable the rules in regard to presumption of validity and partial or entire invalidity; and, just as in individual cases hardship and loss may flow from legislative acts which are nevertheless valid, so administrative regulations may also operate."

*reasonable* exercise of the police power is also reflected *supra* under the first issue. As noted *supra,* the district court found that "there is substantial evidence of record to support a distinction between OEM and non–OEM parts." The potential for substitution of an inferior part in repair, or in an estimate for repair of a vehicle, makes Section 6 of the regulation reasonable. It promotes and protects the safety and welfare of the insured. It promotes proper performance under the contract, i.e., receipt by the insured of the benefit of his bargain. It does not prevent the use of non–OEM parts, but allows their use only with the consent of the insured. Even if not of the same "kind" (brand), the insured can consent to use of the non–OEM part thereby expressing belief of its material soundness, of its fit, of its ability to resist rust, etc. Section 6 of the regulation is a reasonable exercise of police power for the safety and welfare of the insured-consumer.

THIRD ISSUE: REASONABLE RELATIONSHIP BETWEEN SECTION 6 OF THE REGULATION AND ITS PURPOSE

■ That previously said with reference to the first two issues reflects that Section 6 of the regulation does have a "rational connection between the facts found and the choice made." It is "reasonably directed to the accomplishment of the purposes." It thus satisfies the "necessary element of due process of law."

Appellants cite *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Company,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) and 2 Am.Jur.2d, *Administrative Law* § 303 (1962) with reference to those requirements, but appellants argue the applicability of the requirements only on the basis that Section 6 of the regulation is no more than "an interference in market decisions between OEM and non–OEM parts." The authorities cited by appellants require the administrative rule to be "reasonable." The reference to 2 Am.

Jur.2d, *supra,* concerns the *reasonable* requirement. It is followed by § 304, which reads:

"The requirement of reasonableness of an administrative regulation means no more and no less than that the regulation must be based upon reasonable grounds—that is, it must be supported by good reasons. The reasonableness of rules and regulations, and exemptions therein, is determined by their relationship to the statutory scheme they are designed to supplement, protect, and enforce. Reasonableness is determined in view of the stated objectives of the legislation, and if a regulation is within the purpose of the statute it is reasonable.

"Whether a regulation is reasonable depends on the character or nature of the condition to be met or overcome, and the nature of the subject matter of a rule may affect its reasonableness. Thus, the regulation of certain activities involving mere privilege, such as the sale of intoxicating liquor or the conduct of horse racing, is accorded liberal judicial support, and the court is slow to find such regulations unreasonable.

"An administrator has a large range of choice in determining what regulations or standards should be adopted. It is not necessarily a valid objection to his choice that another choice could reasonably have been made, that experts dis[a]greed over the desirability of a particular standard, and that some other method of regulation would have accomplished the same purpose and would have been less onerous. It is enough that the administrator has acted within the statutory bounds of his authority, and that his choice among possible alternatives adopted to the statutory end is one which a rational person could have made.

"In order to set aside a regulation, it must be clearly unreasonable. If reasonable minds may well be divided on the question, the administrator must be upheld. It must be shown that no reasonable administrator would have made such a regulation and that it is so lacking in reason that it is essentially arbitrary."

As set out *supra* under the first two issues, Section 6 of the regulation is primarily directed to protection of the insured, to allow the insured to receive the benefit of his bargain, to further define the ambiguous word "kind" in the policy as approved by the Commissioner, and to promote the safety and welfare of the public. As such, it has a reasonable relation to the purpose for which made.

## FOURTH ISSUE: SUBSTANTIAL EVIDENCE TO SUPPORT SECTION 6 OF THE REGULATION

Although appellants listed this issue in their brief, they did not present any argument with reference to it. We will not consider issues not supported by proper citation of authority or by cogent argument. *Trout v. Wyoming Oil and Gas Conservation Commission,* 721 P.2d 1047 (Wyo.1986); *Elder v. Jones,* 608 P.2d 654 (Wyo.1980); *Armed Forces Cooperative Insuring Association v. Department of Insurance,* 622 P.2d 1318, 1331 (Wyo.1980) appeal dismissed 454 U.S. 1130, 102 S.Ct. 985, 71 L.Ed.2d 284 (1982).[14]

Affirmed.

URBIGKIT, Justice, dissenting.

However characterized, this case questions the statutory right and economic propriety of the recently departed Insurance Commissioner's intervention in behalf of franchised car dealerships who sell replacement parts provided by original car manufacturers. This appeal does not involve identity of original part fabricator since most parts would never have been produced by the vehicle manufacturer. This appeal also does not involve consumer protection or issues of safety, to which I am a fervent subscriber, it speaks to oleomargarine-fair trade type industry protectionist action of government which flowered and generally disappeared in the time of the 1930's, now about sixty years ago. Implicit also is the absolute axiom of inevitable economics, that there is no free lunch: what you get or what costs more carries a due bill for full payment.

This record reveals that within a national effort in separate states by legislative or administrative action, franchised automobile dealerships and the major car manufacturers, e.g., Nissan, Toyota, Ford, General Motors and Chrysler, have authored a campaign to reduce competition from suppliers of car repair replacement parts distributed outside of their franchise system. The Wyoming Automobile Dealers Association directed this attack by requesting intervention by the Wyoming Insurance Commissioner. Clearly, consumer disturbance did not author the effort; it was the special interest group which was disturbed by parts market competition as also involving the interest, to some degree, of some body shops who were affected adversely by reduction in repair billings with lower parts cost.

The cost of elimination of competition will inevitably be charged against the insurance policyholder since generalized cost increases are inevitably laid upon purchasers of the product. In this case, it is the physical damage coverage policyholders and may or may not also include the liability insured motor vehicle owners.[1] No one

---

14. In addition to noting this fact, appellee referred to the holding in *Tri–State Generation and Transmission Association, Inc. v. Environmental Quality Council,* 590 P.2d 1324 (Wyo. 1979) to the effect that the substantial evidence test does not apply to rule making decisions.

1. Attached as appendices are two exhibits found in the record reflecting the price competition feature in cost, where Exhibit I, "Alternative Market Pricing," reduced the OEM list price and, in the second case, Exhibit II, where the competition did not exist, a regular price increase occurred.

It is absurd to contend or conclude that the contested regulation is not a pricing accelerator resulting in increased cost to the user. If the price of the Mustang fender used is OEM costing $148 instead of the competitive item of $82, the insurance policy purchasers will inevitably pay the increased cost which is decreed by anticompetition administrative regulation. If the OEM price is about the same as its competitor, certainly neither the insurance company nor its ultimately responsible insured would care if the local distributorship was the vendor.

If the marketing management concept of consumer behavior has validity, the insured will request the more expensive item as a normalized reaction. Avoidance of cost containment in elimination of competitive supply poses four

questions the significant economics involved or that this "cosmetic part" issue is directed towards fair trading the automobile manufacturer supplied replacement part into a higher priced product for which cost the insurance company and its policyholder will ultimately be charged. Unfortunately, the Insurance Commissioner, who did not understand insurance agency administration in more ways than this, brought his office into the economic fray in favor of the automobile dealers against other "impact part" suppliers at the ultimate cost exposure of the entire insurance coverage purchaser.

The after-market part, which is otherwise labeled as an impact part in the litigation, is described in the proposed regulation to mean "sheet metal or plastic parts which generally constitute the exterior of a motor vehicle, including inner and outer panels." It is one of the curiosities of the subject that what is included is not determined and what is not included is interesting. One description describes inclusion to the cosmetic covering of the operational vehicle. Clearly included are the fenders, doors, hood and quarter panels. Not so clearly included or excluded is the rear deck lid. By definition, the grill may or may not be included, but the headlights are not. Likewise not included is any part of the drive train, including specifically tires and front end steering parts. General Motors Corporation would include the bumper by notation in some literature, but no other source seems to include the bumpers. The definition itself of sheet metal or plastic could well describe the bumper on some vehicle models, but normally, and hopefully not, on most.

Clearly not included are the operational parts of the vehicle like dash, windshield, seats, motor, radiator and drive train as only the shell parts which are subject to first damage by impact. Next to be recognized is that the definition of the market part does not define *manufacturer* as distinguishable from supplier. The differences, of course, exist between the automobile companies, defined for these purposes as the entity that assembles and resells a completed vehicle. How much of the constituent body parts are actually produced by that entity and how many are acquired from independent source subcontractors/suppliers is totally unadvised. The scenario is described in General Motors Corporation literature as:

> For models *still in production*, GM generally produces sheet metal replacement parts in the same plant, *or buys it from the same supplier*, as the original vehicle. *After the model run*, about 80% of the sheet metal production *is turned over to outside suppliers* who use GM tool, know GM specifications, certify to GM quality standards, assure timely delivery and are cost-competitive with other bidders. GM suppliers prove themselves to our standards through frequent audits, and in the quality of the products they provide.

(Emphasis added.)

Although OEM supposedly applies to original equipment manufacture, in application it applies to the assembler or car builder and has no necessary relevance to the actual entity that may have fabricated the part. A non-OEM (non-original equipment manufacturer) is not a company other than the entity from whom the car manufacturer may have acquired the part; it is any vendor other than the car producer which sells replacement parts outside of the franchised dealership. Source of supply for

---

unpleasant results which were minimally, if at all, addressed by the Insurance Commissioner's action. First, cost of insurance coverage will inevitably be increased and specifically for some rated renewal policies which could include that specific individual insured. Secondly, body shop and carrier warranty of repair is subverted by the required use of a one-source part which may be good, bad or indifferent in quality. Third, incidental cost increases in repair for individual vehicles mean more total

loss incurrences since the vehicle may be rendered economically non-repairable. Fourth, and most significantly, policy holder attitude in loss adjustment is directly related to post-loss insurance policy renewal. Some policy holders, inopportunely and without recognizing the risk involved, will request the most expensive repair parts as a question of obtaining a bargain and then find out at the expiration of the policy term that their insurance coverage will not be renewed.

*part* manufacture is not necessarily relevant. A non-OEM parts fabricator may, in some cases, be the same producer who supplied the parts for the original car production as the initial supplier.

There is another anomaly. A substantial part of impact replacement parts come from wrecked vehicles. Used body parts also have a highly favorable pricing structure and, in quality, may often be superior to the so-called new OEM supplied items. Used parts are not subject to the regulatory provisions in the Insurance Commissioner's enactment. For example, a fender (or bumper for this writer's 1975 Pontiac Ventura) would most unlikely come from whatever entity produced that item originally. If the "new" part is available from a dealership at all today, it would be highly unlikely that it would come from the 1975 plant which fabricated the original item. Out-sourcing is the mode today and certainly so for post-production replacement part acquisition. The heart of this litigation *is not sources of fabrication; it is monopoly in distribution.* It is that competition against which the Insurance Commissioner seeks to intervene.[2]

The monopoly maintenance agenda of the franchise car dealerships and car manufacturers arrives with an aura of authenticity. The message is "tell your customer-insured that you will pay for what you sell, no matter what the price, so that he has a choice for the higher priced item." Unfortunately, the intended message is postured to get your money's worth, if more expensive, whether or not better or more usable.

In this statistic society of which we now march for government supervision and regulatory control, I resent this additional adventure which will only affect a higher cost to the consuming public. It must first be made absolutely clear in today's manufacturing, assembling and distribution environment that quality maintenance in this controversy is almost a non-existent factor. The insurance company has an equal responsibility whether the part is supplied through a franchised dealer, comes from another supply network, or, like replacement organs of modern medicine, comes from a compatible donor. The only real valuable "guaranty" provided to the insured is furnished by reputable body shops and a reliable insurance company. An ill-fitted quarter panel or a rusted out fender skirt will never reach any realistically maintainable claim against the car manufacturer or its overseas parts supplier with any greater reliability than will be the case as to the non-OEM part, whether fabricated in Taiwan or St. Louis.

Within this economic environment, I disagree with the majority about existent statutory authority to justify this price fixing regulation and reject sufficiency of the evidence to sustain any exercised administrative agency discretion. In historical perspective, Wyoming, like many states, tried this route for both fair trade legislation and oleomargarine control. From these efforts, both precedent and history reveal that this type of economic protectionism is invalid in application, unsustainable in concept, and improper in adaptation when provided by prohibitive regulation. The majority ignores this historical basis in its present decision and now attempts to re-

---

**2.** There is a third anomaly presented in Section 4 of the regulation as a non-appealed issue which, in term, applies to both the automobile manufacturer and the third-party parts supplier. That section states:

> Section 4. *Identification. All after market parts,* which are subject to this regulation and manufactured after the effective date of this regulation, shall carry sufficient permanent identification so as to identify its manufacturer. Such identification shall be accessible to the extent possible after installation.

(Emphasis added.)

By its specific terms, the provision does apply to both OEM and non-OEM supplies and, according to the record, is impossible to enforce in either case. The problems derived from differentiation between manufacturer and supplier was well addressed in the record and additionally noted in communication between a representative of the Governor's office and personnel in the Insurance Department where the basic authority for the imposed regulation was questioned. The actual fabricator of any replacement impact part (or non-impact part), whether OEM or non-OEM, could obviously have been located in Mexico, Europe or many places in the Asian rim countries.

trace past anti-competition legislation judicial failures.

First addressed was the fair trade laws which became the mode to limit economic competition as flowered in most jurisdictions during the depression of the 1930's. Wyoming's effort was addressed in comprehensive detail by Chief Justice Blume in *State v. Langley*, 53 Wyo. 332, 84 P.2d 767 (1938), finding "ruinous" competition to be an evil, the police power authority of the legislature to prohibit was authenticated by the decision. Fair trade as then applied only really lasted until *Bulova Watch Co. v. Zale Jewelry Co. of Cheyenne*, 371 P.2d 409 (Wyo.1962) when the successor litigation found the parallel act unconstitutional as an improper delegation of legislative power when offending the required due process protection and beyond the police power of the state.[3]

The majority conceptually postulates approval of the dealership fair trade regulation on implied statutory authority and reasonably exercised discretion. I would find premise and conclusion in the majority decision to be faulty in both regards on both issues. To be recognized initially is that only those powers expressly conveyed by the legislature are granted to the administrative agency. *Hupp v. Employment Sec. Com'n of Wyoming*, 715 P.2d 223 (Wyo.1986). Here first, the majority's

source of statutory authority without supporting precedent is extracted from the insurance deceptive practices statutes, W.S. 26–13–101 through 26–13–118. There are two problems with application of this chapter and, particularly, W.S. 26–13–102 specifically cited. In initial misadaptation, these statutes are authored to control insurance selling practices and have nothing at all to do with property damage adjusting activities. We are not authorized to ignore clear statutory language in order to apply legislatively provided provisions to situations that do not reasonably fall within the ambient of the enactment. *Matter of Abas*, 701 P.2d 1153 (Wyo.1985), *overruled on other grounds sub nom. Parnell v. State ex rel. Wyoming Worker's Compensation Div.*, 735 P.2d 1367 (Wyo.1987).

The second fallacy is in finding authorization for the adaptation of regulations which do not exist in the cited statutes. *Tri–County Elec. Ass'n, Inc. v. City of Gillette*, 525 P.2d 3 (Wyo.1974). Unquestionably, the Insurance Commissioner has no inherent or common law power. *Brasel & Sims Const. Co., Inc. v. State Highway Com'n of Wyoming*, 655 P.2d 265 (Wyo. 1982). The regulated and prohibited transactional activities are enunciated in the statute and the remedy provided to the administrative agency is a cease and desist process. Nothing is statutorily stated

---

3. The first statute, as a selling below cost civil and criminal restraint, remains in present Wyoming law. *See* W.S. 40–14–107 through 40–14–116, as continued from adoption as Wyo.Sess. Laws ch. 73 (1937). Two appellate efforts at enforcement, *Civic Ass'n of Wyoming v. Railway Motor Fuels*, 57 Wyo. 213, 116 P.2d 236 (1941) and *Eckdahl v. Hurwitz*, 56 Wyo. 19, 103 P.2d 161 (1940), failed and no recognizable effort at enforcement as well as the companion petroleum products discrimination statute, W.S. 40–14–117 through 40–14–121, can be found or is known to have existed in the past forty years. The exceptions of selling perishables or depreciated quality and opportunity to meet legal prices of competitors in this mass media selling era probably explains the dampened prosecutorial enthusiasm. See the listed exception in W.S. 40–14–110. Overtly, the minimum pricing statute has no realistic sustained validity in the present economy of this state.

The second statute established is Wyo.Sess. Laws ch. 58 (1937), for fair trade was interred on a constitutional infirmity by this court in

*Bulova Watch Co.*, 371 P.2d 409. The third Wyoming legislative effort to favor a particular market and control availability or price was the oleomargarine legislation which the court considered in *Ludwig v. Harston*, 65 Wyo. 134, 197 P.2d 252 (1948), as originally enacted as Wyo. Sess.Laws ch. 137 (1931). The oleomargarine legislation involving color prohibition and excise tax price application also had a short shelf life when repealed by Wyo.Sess.Laws ch. 38 (1949) and Wyo.Sess.Laws ch. 117 (1951). *See* Note, *The Changing Oleomargarine Picture and Wyoming*, 3 Wyo.L.J. 217 (1949).

The 1989 effort of car manufacturers and franchised automobile dealerships proceed for a virtual recreation of the economically and politically discredited fair trades and oleomargarine legislation of the decade, sixty years now past. The difference is here that a state industry regulatory agency through the Insurance Commissioner, without explicit statutory authority, is the source of the regulatory constraints and not the popularly elected state legislature.

about fair trading a particular supplier of replacement parts and nothing is stated authorizing adoption of implementing or amendatory regulations to enforce the specific prohibitions provided in statutory text. No statutory extension without explicit authorizing provision can justify this stretch to validate administrative agency rule adaptation where express authority has previously been required by our strict construction precedent. *McNeill v. Park County School Dist. No. 1*, 635 P.2d 818 (Wyo.1981); *Tri–County Elec. Ass'n, Inc.*, 525 P.2d at 9. Consequently, the statutory citation by the majority is erroneous in two regards. First, the subject addressed by the cited statute is different, and secondly, authorization for regulatory implementation of the statutory prohibition stated is not provided and particularly so to add criminal penalties to a cease and desist enforcement provision. It is the regulation that must be reconciled with authenticating statute and not the statute to be reconciled with the administrative regulation. The regulation must be consistent with the statute in addressing the same subject, if it does. In this case, the adopted regulation finds no proper or even actual parentage in the enacted statute. *Gudmundson v. State*, 763 P.2d 1360 (Alaska App.1988).

The second statute cited by the majority is the recently enacted Wyo.Sess.Laws ch. 43 (1986), the unfair claims settlement practices statute, W.S. 26–13–124. This statute at least relates to the subject of adjustment and claim settlement.[4] That statute identifies fourteen prohibited activities, none of which relate to controlling supplies of replacement parts. Although quoted and cited by the majority, the statute provides no authorization for the adaptation of implementing regulations by the Insurance Commissioner to supplement the stated explicit prohibitions clearly enumerated. Again, nothing in that statute, its stated purpose or text indicates authorization for control of source of repair parts by designating a vendor or, for that matter, the part fabricator. No criminal provision was provided in the session law enactment. Crimes can only be created by the legislature, *Baum v. State*, 745 P.2d 877 (Wyo.1987), since the state has no common law offenses. W.S. 6–1–102.

We have recently restated the guiding mandate:

> [T]his court cannot constructively expand statutory powers conferred upon an agency by the legislature, and the statutes which create and delegate authority * * * must be construed strictly with any reasonable doubt as to the existence of regulatory power resolved against the exercise of such power.

*Matter of Mountain States Tel. and Tel. Co.*, 745 P.2d 563, 568 (Wyo.1987). By *Matter of Mountain States Tel. and Tel. Co.*, we demonstrated a disinclination to expand statutes to justify expensive regulatory authority, which was in that case to regulate the publication of an advertising directly. Conversely here, the majority now implies a rule making authority completely independent of statutory justification to control source of supply of certain repair parts chargeable in cost to the insurance carrier which may have written physical damage coverage for a particular vehicle.[5]

---

**4.** This statute provides persuasion that the earlier statute relating to the subject of sales technique did not constitute a broad authorization for the Insurance Commissioner to adopt regulations on this dissimilar subject. Otherwise, there was no need for the legislature to enact the very specific provisions included as statutorily itemized prohibitions.

**5.** W.S. 26–13–124 includes provisions which involve both first party and third party adjusting and settlement conduct. The presently contested regulation in the Section 6 consent requirement apparently relates only to first party relationship, namely adjustment with the insured.

However, its language becomes cloudy in text even though the ten-point type declaration found in Section 6(b) ascribes notation on the *insured's* estimate and not necessarily one prepared for a *third party liability claimant*. An interesting problem is created if the exception exists that the insurance code has been extended to only provide criminal penalties enforceable against the body shop when any estimate is prepared for an *insured* and not a claimant by failure to comply with the ten-point declaration criteria of Section 6 of the Insurance Commissioner's regulation. It is additionally not clear that the disclosure requirement for any estimate to be prepared for *an insured* is limited only to

I am further unable to follow an attribution of W.S. 26–13–116 which is the administrative enforcement section to authorize adoption of self-standing regulations.[6] It is suggested that the majority misreads the statutory enforcement provision speaking in terms of cease and desist to be a delegation of power rule adoption provision. Furthermore, W.S. 26–13–102 does not add justification as statutory authority *to adopt*

*rules* involving fair trading parts suppliers to franchised dealerships. The additional citation of W.S. 26–13–106 within the provence of a cease and desist proceeding adds no further substance to any contention of statutory authority.

Not finding adequately stated authority for the particular type of rule adaptation within Chapter 13 of the Wyoming Insurance Code, W.S. 26–13–101 to 26–13–124,

the impact replacement part within the broad terminology used in subsections (a) and (b) of Section 6.

6. W.S. 26–13–116 states:

(a) If the commissioner believes that any person in conducting an insurance business in this state is engaging in any method of competition or in any act or practice, not defined in this chapter, which is unfair or deceptive and that a proceeding by him in respect thereto would be in the public interest, after a hearing in which the person charged receives a notice of the hearing and of the charges against him, the commissioner shall make a written report of his findings of fact relative to the charges and serve a copy thereof upon the person and any intervenor at the hearing.

(b) If the commissioner's report charges a violation of this chapter and if the method of competition, act or practice is not discontinued, the commissioner, through the attorney general, at any time after service of the report, may cause an action to be instituted to enjoin and restrain the person from engaging in the method, act or practice. In the action the court may grant a restraining order or injunction upon any just terms, but the people of this state are not required to give security before the issuance of the order or injunction. If a stenographic record of the proceedings in the hearing before the commissioner is made, a certified transcript thereof including all evidence taken and the report and findings shall be received in evidence in the action.

(c) If the commissioner's report made under subsection (a) of this section or order on hearing made under W.S. 26–2–128 does not charge a violation of this chapter, then any intervenor in the proceedings may appeal within the time and in the manner provided in W.S. 26–2–129(b).

Conversely, the enforcement provision in the regulation, Section 7, states:

Any individual, firm or corporation who shall violate any of the provisions of these After Market Parts Regulations shall be punishable in accordance with W.S. 26–1–107.

W.S. 26–1–107, as a criminal statute, provides:

(a) Each violation of this code [title 26] for which a greater penalty is not provided by another provision of this code or by other applicable laws of this state, in addition to any applicable prescribed denial, suspension

or revocation of certificate of authority or license, is a misdemeanor punishable upon conviction by a fine of not more than one thousand dollars ($1,000.00), or by imprisonment in the county jail for not more than six (6) months, or both. Each violation is a separate offense.

(b) Any person who violates any provision of this code, any lawful rule or final order of the commissioner or any final judgment or decree made by any court, upon the commissioner's application, shall pay a civil penalty in an amount the commissioner determines of not more than two thousand five hundred dollars ($2,500.00) for each offense, or twenty-five thousand dollars ($25,000.00) in the aggregate for all such offenses within any three (3) month period. In the case of individual agents or adjusters, the civil penalty shall be not more than five hundred dollars ($500.00) for each offense or five thousand dollars ($5,000.00) in the aggregate for all such offenses within any three (3) month period. The penalty shall be collected from the violator and paid by the commissioner, or the appropriate court, to the state treasurer to the credit of the general fund.

(c) Before the commissioner imposes a civil penalty, he shall notify the person, agent or adjuster accused of a violation, in writing, stating specifically the nature of the alleged violation and fixing a time and place, at least ten (10) days from the date of the notice, when a hearing of the matter shall be held. After hearing or upon failure of the accused to appear at the hearing, the commissioner shall determine the amount of the civil penalty to be imposed in accordance with the limitations expressed in subsection (b) of this section. Each violation is a separate offense.

(d) A civil penalty may be recovered in an action brought thereon in the name of the state of Wyoming in any court of appropriate jurisdiction, and the court may review the penalty as to both liability and reasonableness of amount.

(e) The provisions of this section are in addition to and not instead of any other enforcement provisions contained in this code.

The administrative regulation apparently attempted to substitute the criminal penalty for the cease and desist provisions expressly provided by statute.

the majority then reaches for outside authority granted to the Insurance Commissioner to supplement the explicit statutory provisions to justify this adoption of his own wash list of adjusting requirements, including fair trading parts suppliers. That resource is claimed from within the general authority provided by W.S. 26–2–110 and 16–3–101. Unfortunately, it is perceived that the reasoning used has gone around in a circle and provided no statutory authority for adoption of a source consent repair part provision to fair trade in favor of one supplier or to create administratively criminal offenses. There simply is no effectuating statute granting authority to the administrative agency to augment or amend what the legislature has done or not done in express prohibition.[7]

Lacking definable statutory authority, cause remains to address the exercised discretion and rule adaptation as if that authority did exist. To properly understand this litigation, it is necessary to reflect that impact parts (however they may be defined) in number, constitute only a small portion of the number of assembled items constituting the motor vehicle. Secondly, the record reflects testimony that this particular appellant, as a major in automobile insurance, started using non-OEM parts two years earlier and that only seven percent of their appraisals included these items. The factual significance demonstrated is that competition reduces price and monopoly increases price.[8] Availability and possible use is the critical factor in pricing moderation.

Why then does administrative agency exercised discretion properly run to require the preferential use of a more expensive installation and to enforce disclosure by a criminal sanction?[9] The majority here hangs argument not on equivalency of quality, but on characterized "like kind." The only "like kind" fender for the mythi-

---

7. From a statutory adoption perspective, the imposed regulation has no greater validity than would a regulation that the automobile insurance carrier shall not provide physical damage or comprehensive coverage for any Pontiac Ventura that is older than fifteen years or that the insurance company is not required to pay for a part available for sale by a franchised dealership unless priced no more than parts or equipment equal in workmanship no matter where acquired from any other supplier. If the damaged battery was a Delco, could no other battery of whatever higher price be supplied? A more pertinent regulation would address pricing and parts used if repair was made by the franchised dealer's garage. Obviously, fair trading regulatory gambits can go any direction the political powers of the particular moment might justify.

8. The responsibility for monopoly maintenance is no different than those considerations reflected by the United States Supreme Court in *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 166–67, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) (footnotes omitted), which stated:

[T]he choice * * * may not be automatic; it must be rational and based upon conscious choice that in the circumstances the public interest is "adequate, economical and efficient service" outbalances whatever public interest there is in protecting existing carriers' revenues in order to "foster sound economic conditions * * *."

There are no findings and no analysis here to justify the choice made, no indication of the basis on which the Commission exercised its expert discretion. We are not prepared to and the Administrative Procedures Act will not permit us to accept such adjudicatory practice.

Here lies a further anomaly. It is not suggested that the non-OEM parts are more frequently installed than used parts nor that other automobile parts do not involve a measurably greater portion of the market than impact parts. This litigation is logically confined by a rule of economics within a specified but otherwise undistinguishable market that competition reduces price and monopoly increases price. The supposition is for the economic interest when they can get government to provide a monopoly for what they may distribute, that non-competitive opportunity will serve well in profitability and particularly so if the monopoly product is needed and otherwise non-available.

9. *Cf. Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), which considers exercised discretion to *deny* implementing safety equipment manufacturing requirements for the motor vehicle. In *Motor Vehicle Mfrs. Ass'n of United States, Inc.*, the insurance company stood on the side of safety against the resistance of the vehicle manufacturers when the administrative agency failed to exercise proper discretion in rescinding vehicle manufacturer requirements for installation of safety equipment. The action here is not less arbitrary and capricious where again directed to maximize manufacturer profits at the cost of the automobile user.

cal 1975 Pontiac Ventura would be one produced by the identical supplier for the original car manufacturer, whether affiliated or subcontractor. The odds of acquiring a fender for the Pontiac Ventura produced by the same factory existent fifteen years ago is, at best, accidental. Today, if repairs were required to a 1985 Jeep Waggoneer, Chrysler, as the supplier, would likely not have the same fabricator as did American Motors only five years ago. The same Mexican, Asian, European or even American plant could have supplied OEM parts for the Waggoneer as would supply non-OEM parts today. It is a well known fact in the automobile industry that at least in times past better cars of identical models came from different factories when compared between factory A and factory B and some part fabricators provided a substantially better product than others who may have been producing the "identical" or "like kind" item.[10] Unfortunately, nothing provided in the contested regulation, Section 6, serves to assure that use of

the same "kind of part" will provide one identically fabricated or provide increased safety or welfare.[11] Here again, the American industry group seeks assistance of the government to provide competitive advantage from the pressures of a free economy. I might still be concerned constitutionally if the legislature accepted such a 1930 challenge to address a 1990 world economy. However, that is not this case where this public official, who was not elected, undertook this special interest market management by self-standing administrative regulation.

"When exercising its police powers, the State must act reasonably and cannot, under the guise of such powers, impose unreasonable or arbitrary regulations." *Big Piney Oil & Gas Co. v. Wyoming Oil and Gas Conservation Com'n*, 715 P.2d 557, 563 (Wyo.1986).

I respectfully dissent from any judicial approval of this non-legislatively authorized Insurance Commissioner regulation.

---

**10.** Also, at least in times past, it was at least considered in the automobile repair rebuilding and insurance industries that what is now designated as OEM were sometimes original rejects when set aside in the assembly line for fault or misfit. When, as here, "quality" looses pertinence for adaptation of the artificial characterization of "like kind," value and sufficiency are expressly ignored. Brand and kind and not comparative value and usefulness becomes the validating difference for justification of the higher price.

The significance of impact parts to automobile insurance is self-evident. Normally, most damage is to the impact parts first, although radiators and windshields do not fall far behind. Why the classification of impact parts has discriminatory justification is not explained in testimony or present majority decision. The differentiation totally lacks validity when questioning inclusion or exclusion of a hood and possibly a deck lid, while the radiator, a head light, the water pump and the front end axle and steering mechanism are excluded.

**11.** I have another problem with the contested regulation which is ill-considered in briefing and in the majority opinion. Section 6 has two regulatory subjects—insurers and automobile

repair companies—against whom criminal punishment can jointly or alternatively be assessed. The general criminal provision of the Wyoming Insurance Code, W.S. 26–1–107, is brought into a statutory cease and desist process by administrative agency regulations to create crimes which may have been committed not only by the insurer, but also by the body shop which makes repair estimates and may then sometimes complete repair. The entire subject of equal and equivalent substitution is implicated by the created criminal regulatory enactment. The body shop provides both the disclosure and subsequent part installation compliance or non-compliance. For example, lesser cost part substitution with or without kick back to the insured is apparently involved in prohibitory purview.

Automobile repair parts (impact or otherwise) are used by body shops; estimates are prepared by the body shop and used by the insurance company. Consequently, the Wyoming Insurance Code is supplemented or expanded by administrative regulation to overtly create crimes which may be committed not only within the regulated insurance industry, but also the unregulated "individual, firm or corporation" which expansively includes the body shop and its personnel.

## EXHIBIT
### EFFECTS OF PRICE COMPETITION
### CRASH PART PRICES
### COMPARISON *
### OEM VS. AFTERMARKET

| | | KEYSTONE | HILLARD | OEM LIST | | | |
|---|---|---|---|---|---|---|---|
| | | LIST | LIST | 1986 | 1985 | 1984 | 1983 |
| MUSTANG ('79–'85) | FENDER | $73.00 | $70.52 | $82.00 | $82.00 | $82.90 | $148.15 |
| ARIES (1981) | FENDER | $77.00 | $65.09 | $86.50 | $86.50 | $180.16 | $221.08 |
| OMNI (1983) | FENDER | $67.00 | $64.93 | $75.50 | $75.50 | $75.50 | $140.20 |
| SENTRA ('82–'85) | FENDER | $106.00 | $56.32 | $67.50 | $125.62 | $136.30 | $112.22 |
| COROLLA (1981) | FENDER | $71.00 | $58.96 | $61.38 | $79.27 | $116.89 | $116.89 |

*SOURCE = THE MOTOR CRASH ESTIMATING GUIDE

---

## EXHIBIT II
### EFFECT OF LACK OF COMPETITION
### CRASH PART PRICES COMPARISON *
### OEM VS. AFTERMARKET

| | | KEYSTONE | | HILLARD | | OEM LIST | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | LIST | BODYSHOP | LIST | BODYSHOP | 1986 | 1985 | 1984 | 1983 |
| CAPRICE ('80–'85) | FRONT DOOR SHELL | $—— | $—— | $—— | $—— | $725.00 | $637.00 | $608.00 | $593.00 |
| CITATION ('80–'85) | FRONT DOOR SHELL | $—— | $—— | $—— | $—— | $576.00 | $506.00 | $483.00 | $471.00 |
| MONTE CARLO ('81–'85) | FRONT DOOR SHELL | $—— | $—— | $—— | $—— | $581.00 | $511.00 | $488.00 | $476.00 |
| DEVILLE ('80–'84) | FRONT DOOR SHELL | $—— | $—— | $—— | $—— | $725.00 | $637.00 | $608.00 | $593.00 |

*SOURCE = THE MOTOR CRASH ESTIMATING GUIDE

